**CERA LLP**
Solomon B. Cera (State Bar No. 099467)
Thomas C. Bright (State Bar No. 169713)
595 Market Street, Suite 1350
San Francisco, California 94105
Telephone: (415) 777-2230
Facsimile: (415)-777-5189
Email: scera@cerallp.com
Email: tbright@cerallp.com

**THE DAVID HODGES LAW FIRM**
David A. Hodges (*Admitted pro hac vice*)
212 Center Street, 5th Floor
Little Rock, Arkansas 72201
Telephone: (501) 374-2400
Facsimile: (501) 374-8926
Email: david@hodgeslaw.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DOTSTRATEGY, CO., Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FACEBOOK, INC. <br><br> Defendant. | Case No. 20-cv-00170-WHA <br><br> **CLASS ACTION** <br><br> **FIRST AMENDED COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE §17200 *ET SEQ.*** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff dotStrategy, Co., individually and on behalf of all others similarly situated, by and through its counsel, and upon personal knowledge as to facts known to Plaintiff, and as to all other facts upon information and belief following investigation of counsel, alleges as follows against Defendant Facebook, Inc. ("Facebook"). The investigation of Plaintiff's counsel into the factual allegations contained herein is continuing. Many of the relevant facts are known only by the Defendant, or are exclusively within its custody and control. Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein and that such evidence will be available after a reasonable opportunity for discovery.

## INTRODUCTION AND OVERVIEW

1. Facebook is the world's largest social media services company. Facebook provides its users with an online platform ("Platform") that allows its users to connect and share photos, videos, and other content with family and friends online.

2. This case concerns the large number of fake accounts on the Platform in violation of Facebook's "authenticity policy" and Terms of Service, and the significant amount of advertising revenue that these fake accounts generate for Facebook. Advertisers are charged for actions generated through fake Facebook accounts, and when these accounts are determined by Facebook to be fake, the advertising revenue generated by these accounts is not refunded to advertisers such as plaintiff. This is contrary to Facebook's representations that advertisers will not be charged for "[c]licks generated through prohibited means, such as fake accounts," and significant monetary injury has, as a result, been incurred by Plaintiff and the members of the Class.

3. According to Facebook, its primary product "enables people to connect, share, discover, and communicate with each other on mobile devices and personal computers. There are a number of different ways to engage with people on Facebook, including News Feed, Stories, Marketplace, and Watch." Facebook was the first social network to surpass 1 billion registered accounts and as of January

2020, has almost 2.45 billion users.[1]  As of December 31, 2019, Facebook reported that its average daily active users ("DAUs") were 1.66 billion on average, an increase of 9% year over year.[2]

4. Facebook does not charge users to access the platform.  Instead, it generates substantially all of its revenue from selling advertising placements to marketers.  In fiscal year 2019, Facebook generated $70.7 billion in revenue, of which $69.65 billion was advertising revenue.[3]

5. As Mark Zuckerberg, the CEO of Facebook, explained in his testimony on April 11, 2018, to the U.S. House of Representatives, Committee on Energy & Commerce ("House Testimony"):

> The business model is running ads.  And we use data that people put into the system in order to make the ads more relevant, which also makes them more valuable.  But what we hear from people is that, if they are going to see ads, they want them to be good and relevant.[4]

6. He also stated: "targeting [advertising] helps small businesses be able to afford and reach people as effectively as big companies have typically had the ability to do for a long time."[5]

7. Fake accounts violate Facebook's Terms of Use and its authenticity policy.  As Zuckerberg, explained in his testimony on April 10, 2018, to the United States Senate, joint session of the Committees on the Judiciary and Commerce, Science and Transportation ("Senate Testimony"):

> Well, you're not allowed to have a fake account on Facebook.  Your content has to be authentic.  So we build technical tools to try to identify when people are creating fake accounts — especially large networks of fake accounts, like the Russians have — in order to remove all of that content.

8. If a user wishes to advertise on Facebook, they go to the Facebook Ads Manager portion of the Facebook platform that is created by Facebook to allow users to design their advertising campaigns.

---

[1] *See* https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users/ (last visited March 11, 2020).

[2] *See* Facebook Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed with the U.S. Securities Exchange Commission ("SEC") on January 30, 2020 ("2019 10-K"), at p. 44.
[3] *Id.* at p. 55-56.

[4] https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/20180411-FC%20Facebook%20Transparency%20and%20Use%20of%20Consumer%20Data.pdf (last visited March 30, 2020).

[5] *Id.*

The first option that appears in the Facebook Ads Manager is to select an objective, such as "Engagement" or "Traffic," for the user's campaign. For example, the objective of advertising campaigns known as "Engagement" is to "[g]et more people to follow your Page or engage with your posts through comments, shares and likes. You can also choose to optimize for more event responses or offer claims." Once the objective is selected, the user is directed to the "Audience" screen, where the user can "choose the demographics, interests and behaviors that best represent your audience," such as age or location. The user then decides where to run the advertising campaign, whether on Facebook, Instagram (which is owned by Facebook), or another Facebook product. The user then sets the budget, chooses the format for the advertising campaign and places the order. Thereafter, the user can track the performance of the advertising campaign.[6]

9. "The pricing of Facebook ads is based on an auction system where ads compete for impressions based on bid and performance. When you run your ad, you'll only be charged for the number of clicks or the number of impressions your ad received."[7] Because the Facebook advertiser pays for each interaction or engagement with the campaign objective, it is important for the efficacy of the campaign that the user is only charged for engagements with real people. Indeed, when the user is paying for advertising, Facebook promises that the advertiser "will not be charged for clicks that are determined to be invalid," which Facebook defines as "[c]licks from people that don't indicate a genuine interest in the ad or show signs of ad testing. This includes repetitive or accidental clicks and visits from the Facebook corporate network" and "[c]licks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook Terms."[8]

10. In her prepared statement of September 5, 2018, to the United States Senate Select Committee on Intelligence ("Senate Testimony"), Sheryl Sandberg, Chief Operating Officer of

---

[6] *See*, https://www.facebook.com/business/ads/ad-objectives (last visited April 28, 2020).

[7] https://www.facebook.com/business/help/716180208457684?id=1792465934137726 (last visited April 28, 2020).

[8] https://www.facebook.com/business/help/211248262238771 (last visited March 31, 2020).

Facebook, stated that Facebook "block[s] millions of attempts to register fake accounts every day. Globally, we disabled 1.27 billion fake accounts from October 2017 to March 2018"[9]

11.     As Ms. Sandberg explained in her Senate Testimony:

> Our first line of defense is finding and shutting down fake accounts, the source of much of the inauthentic activity we see on Facebook. Authenticity matters because people need to trust that the content they are seeing is valid and they need to trust the connections they make. We are now blocking millions of attempts to register false accounts each and every day.

12.     In Facebook's written responses to questions for the record following Ms. Sandberg's testimony, it stated:

> We also announced in April [of 2018] that people who manage large Pages with large number of followers will need to be verified. Those who manage large pages that do not clear the process will not be able to post. This will make it much harder for people to administer a Page using a fake account, which is strictly against our policies. We will also show people additional context about Pages to help people have more information to evaluate the content. For example, you can see whether a page has changed its name.[10]

13.     On December 21, 2018, Facebook published the article, "Changes We Made to Ads in 2018," in which Facebook stated, "To prevent organizations and individuals from creating accounts that mislead people about who they are or what they're doing, we required people who manage Pages with large audiences to be verified." This verification process is designed to prevent people who manage Pages with large audiences from being able to post or advertise (boost posts) on the Platform, unless their accounts have been verified as authentic. It does not prevent Facebook from generating revenue from the vast majority of fake accounts that populate its Platform, as Facebook does not verify the authenticity of all of the accounts to which impressions are delivered or through which actions are generated and for which Facebook charges advertisers. Therefore, when an impression is delivered to a fake account or an

---

[9] https://www.intelligence.senate.gov/sites/default/files/documents/os-ssandberg-090518.pdf (last visited on March 31, 2020).

[10] https://www.intelligence.senate.gov/sites/default/files/documents/os-ssandberg-090518.pdf (last visited on March 31, 2020).

action is generated through a fake account, the user is charged for that interaction, despite the fact that the interaction does not lead to commercial exposure and business opportunities arising from the engagement of an authentic account with the advertising campaign.

14.     In the fourth quarter of 2019, Facebook estimated that fake accounts represented approximately 5 percent of monthly active users ("MAU") on Facebook.[11]

15.     In its most recent Community Standards Enforcement Report dated November 2019, Facebook states that its "goal is to remove as many fake accounts on Facebook as we can."  Facebook claims therein:

> [O]ver the past two quarters, we have improved our ability to detect and block fake, abusive accounts.  We can estimate that every day, we prevent millions of attempts to create fake accounts using these detection systems. Because we are blocking more attempts to create fake, abusive accounts before they are even created, there are fewer for us to disable and, thus, accounts actioned has declined since Q1 2019.   Of the accounts we actioned, the majority were caught within minutes of registration, before they became a part of our monthly active user (MAU) population.  Our proactive rate remained above 99% for both quarters.  Prevalence for fake accounts continues to be estimated at approximately 5% of our worldwide monthly active users (MAU) on Facebook.[12]

16.     Yet, if Facebook charges and is paid by a user for an impression that is delivered to, or an action that is generated through, an account Facebook determines to be fake, it does not refund the money paid by the user for their campaign.

17.     Plaintiff's analysis of its own Facebook advertising campaign results reveals it was charged and paid for actions generated through fake accounts and Facebook has failed to refund the money paid by Plaintiff for those actions.

18.     As a result of Facebook's failure to verify the authenticity of accounts through which an impression is delivered or an action is generated during an advertising campaign, Plaintiff and other Facebook advertisers paid for a material number of interactions for which they would not have agreed to pay anything at all had they known that these engagements would be generated through fake accounts.

---

[11] Facebook 2019 10-K at p. 28.

[12] https://transparency.facebook.com/community-standards-enforcement#fake-accounts (last visited on April 4, 2020).

19.     Based on Facebook's deceptive and misleading promotion of its promise that users would only be charged for impressions delivered to, or actions generated through authentic accounts, and its deceptive and misleading practice of charging for impressions delivered to, and actions generated through fake accounts to maximize its revenue, this action seeks damages, restitution, and injunctive relief on behalf of Plaintiff and the Class (as defined below).

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because: (i) members of the Class are citizens of a State different from that of Defendant Facebook; and (ii) aggregating the claims of individual Class members, the total matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs.  Further, 28 U.S.C. § 1332(d)(5) does not apply because (i) the Defendant is not a State, State official, or other governmental entity against whom the Court may be foreclosed from ordering relief, and (ii) the number of members of the Class in the aggregate exceeds 100.

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant is headquartered in this District, and a substantial part of the events and transactions giving rise to the claims alleged herein occurred in this District.

## PARTIES

22.     Plaintiff dotStrategy, Co. is an Arkansas For Profit Corporation, headquartered in Conway, Arkansas.  Non-party Bill Doshier is the sole Managing Member of Plaintiff.  Plaintiff operates the .buzz domain registry.  Plaintiff's website is located at: get.buzz, and its DotBuzz Facebook Page can be accessed at https://www.facebook.com/buzznames/.  Plaintiff is committed to growing its small business and building the .buzz brand.  Plaintiff paid Facebook for actions generated through fake Facebook accounts and has not received any refunds from Facebook for these actions.

23.     Defendant Facebook is a Delaware corporation with its principal place of business at 1601 Willow Road, Menlo Park, California 94025, which is located in this District.  Facebook's common stock trades on the Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "FB."  Facebook's market capitalization as of June 28, 2019 was approximately $478 billion.

24.     Facebook engaged in the wrongful acts alleged herein in California; conceived, reviewed, approved, directed, and controlled the deceptive, unfair, and misleading conduct alleged herein in California; and invoiced and collected the fees wrongfully charged from such deceptive, unfair, and misleading conduct, in California.

SUBSTANTIVE ALLEGATIONS

**A.     Facebook's Business**

25.     Facebook claims to "build useful and engaging products that enable people to connect and share with friends and family through mobile devices, personal computers, virtual reality headsets, and in-home devices.  We also help people discover and learn about what is going on in the world around them, enable people to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest family members and friends to the public at large, and stay connected everywhere by accessing our products . . . ."  Facebook's eponymous primary product "enables people to connect, share, discover, and communicate with each other on mobile devices and personal computers. There are a number of different ways to engage with people on Facebook, including News Feed, Marketplace, and Watch."[13]

26.     In testimony on October 31, 2017, to the United States Senate Committee on the Judiciary, Subcommittee on Crime and Terrorism ("Senate Judiciary Subcommittee Testimony"), Colin Stretch, General Counsel for Facebook, described Facebook's authenticity policy as follows:

> Our authenticity policy is the cornerstone of how we prevent abuse on our platform, and was the basis of our internal investigation and what we found.  From the beginning, we have always believed that Facebook is a place for authentic dialogue, and that the best way to ensure authenticity is to require people to use the names they are known by.  Fake accounts undermine this objective, and are closely related to the creation and spread of inauthentic communication such as spam—as well as used to carry out disinformation campaigns like the one associated with the Internet Research Agency (IRA), a Russian company located in St. Petersburg.[14]

---

[13] Facebook 2019 10-K at p. 7.

[14] https://www.judiciary.senate.gov/imo/media/doc/10-31-17%20Stretch%20Testimony.pdf (Last visited April 30, 2020).

27.     Facebook states that "[t]he majority of our marketers use our self-service ad platform to launch and manage their advertising campaigns.  We also have a global sales force that is focused on attracting and retaining advertisers and providing support to them throughout the stages of the marketing cycle from pre-purchase decision-making to real-time optimizations to post-campaign analytics.  We work directly with these advertisers, as well as through advertising agencies and resellers.  We operate more than 70 offices around the globe, the majority of which have a sales presence.  We also invest in and rely on self-service tools to provide direct customer support to our users and partners"[15]

28.     As of January 30, 2020, Facebook described its advertising revenue as follows:

> We generate substantially all of our revenue from advertising.  Our advertising revenue is generated by displaying ad products on Facebook, Instagram, Messenger, and third-party affiliated websites and mobile applications.  Marketers pay for ad products either directly or through their relationships with advertising agencies or resellers, based on the number of impressions delivered or the number of actions, such as clicks, taken by users.
>
> We recognize revenue from the display of impression-based ads in the contracted period in which the impressions are delivered.  Impressions are considered delivered when an ad is displayed to a user.  We recognize revenue from the delivery of action-based ads in the period in which a user takes the action the marketer contracted for.  The number of ads we show is subject to methodological changes as we continue to evolve our ads business and the structure of our ads products.  We calculate price per ad total as total revenue by the number of ads delivered, representing the effective price paid per impression by a marketer regardless of their desired objective such as impression or action.  For advertising revenue arrangements where we are the principal, we recognize revenue on a net basis.[16]

**B.     How to Advertise on Facebook**

29.     Facebook purports to "offer advertising solutions for every level of expertise."  Facebook states: "You don't have to be an expert to start advertising on Facebook.  Create and run campaigns using simple self-serve tools, and track their performance with easy-to-read reports.  More than two billion people use Facebook every month—so no matter what kind of audience you want to reach, you'll find

---

[15] *Id.* at 8.

[16] *Id.* at 54.

them here."  Facebook also claims that "1.6 billion people worldwide are connected to a small business on Facebook."[17]

30.    If you want to place an advertisement on Facebook, there is a "Here's how to create a Facebook ad" page, which sets forth the steps to be taken to begin an ad campaign, steps which Plaintiff took, as follows:

a.    "*Choose your objective.*  To choose the right ad objective, answer the question 'what's the most important outcome I want from this ad?'  It could be sales on your website, downloads of your app or increased brand awareness.

b.    *Select your audience.*  Using what you know about the people you want to reach—like age, location and other details—choose the demographics, interests and behaviors that best represent your audience.

c.    *Decide where to run your ad.*  Next, choose where you want to run your ad—whether that's on Facebook, Instagram, Messenger, Audience Network, or across them all.  In this step, you can also choose to run ads on specific mobile devices.

d.    *Set your budget.*  Enter your daily or lifetime budget and the time period during which you want your ads to run.  These limits mean that you'll never spend more than you're comfortable with.

e.    *Pick a format.*  Choose from six versatile ad formats—they're designed to work on every device and connection speed.  You can choose to show a single image or video in your ad, or use a roomier, multi-image format.

f.    *Place you order.*  Once you submit your ad, it goes to our ad auction which helps get it to the right people.

g.    *Measure and manage your ad.*  Once your ad is running, you can track performance and edit your campaign in Ads Manager.  See if one version of your ad is working better than another, or if your ad is being delivered efficiently, and make tweaks and adjustments as needed."[18]

---

[17] https://www.facebook.com/business/ads (last visited April 28, 2020).

[18] *Id.*

31.     If a user wishes to "get people's attention," Facebook recommends one of the two Awareness Objectives: (a) Brand Awareness (Facebook shows ads to people who are more likely to pay attention to them); or (b) Reach (Facebooks shows ads to the maximum number of people in one's audience while staying within the designated budget).

32.     If a user wishes to "get people to engage," Facebook suggests one of six following Consideration Objectives:

(a)     Traffic (designed to grow the number of people who are visiting your site, app or Messenger conversation, and increase the likelihood they will take a valuable action when they get there);

(b)     Engagement (designed to get more people to follow your page or engage with your posts through comments, shares, and likes);

(c)     App installs (designed to drive more installs of the user's app by linking to the App Store and Google Play store);

(d)     Video views (supposed to show the advertisers videos to people who are most likely to be interested in them);

(e)     Lead generation (the goal of which is to make it easy for interested people to learn more about your business); and

(f)     Messages (the goal of which is to prompt people to open more Messenger interactions).

33.     Finally, if goal of the advertising campaign is to "get people to act with conversions," Facebooks suggests one of the three following Conversion Objectives:

(a)     Conversions (designed to increase actions on your site or app);

(b)     Store visits (designed to drive store visits, sales and other valuable actions at the advertisers physical store locations); and

(c)     Catalog sales (designed to automatically promote the advertiser's most relevant products from its catalog).[19]

---

[19] *See* https://www.facebook.com/business/ads/ad-objectives (last visited April 28, 2020).

34.     The pricing of Facebook advertising is based on an auction system where ads compete for impressions based on bid and performance.  When a user runs their ad, they are only charged for the number of clicks or the number of impressions the ad receives.[20]

35.     Facebook claims by using "an ad auction to determine the best ad to show to a person at a given point in time" that will result in "the winning ad maximize[ing] value for both people and businesses."[21]

36.     With respect to ad auctions, Facebook represents that "[e]ach time there's an opportunity to show an ad to someone, an auction takes place to determine which ad to show to that person.  Billions of auctions take place every day across the Facebook family of apps."[22]

37.     Facebook proudly claims that "[w]hen advertisers create ads, they tell us who they want to show their ads to by defining a target audience.  A person can fall into multiple target audiences.  For example, one advertiser targets women who like skiing, while another advertiser targets all skiers who live in California.  The same person (in this case, a female skier who lives in California) could fall into the target audience of both advertisers.  Where there's an opportunity to show someone an ad, the ads with a target audience that the person belongs to are eligible to compete in the auction."[23]

38.     Facebook claims that "to ensure that the winning ad maximizes value for both people and businesses, the winner of the auction is the ad with the highest total value.  The total value is a combination of 3 major factors:

- **Bid**: The bid placed by the advertiser for that ad (in other words, what the advertiser is willing to pay to achieve their desired outcome).  There are multiple ways to manage your bid in the ad auction.

---

[20] *See* https://www.facebook.com/business/help/716180208457684?id=1792465934137726 (last visited April 8, 2020).

[21] https://www.facebook.com/business/help/430291176997542?id=561906377587030 (last visited April 8, 2020).

[22] *Id.*

[23] *Id.*

- **Estimated action rates**: An estimate of whether a particular person engages with or converts from a particular ad (in other words, the probability that showing an ad to a person leads to the desired outcome of the advertiser).
- **Ad quality**: A measure of the quality of an ad as determined from many sources including feedback from people viewing or hiding the ad and assessments or low-quality attributes in the ad, such as too much text in the ad's image, withholding information, sensationalized language, and engagement bait."[24]

39. Facebook further claims that: "Together, estimated action rates and ad quality measure ad relevance. In fact, we subsidize relevant ads in auctions, so more relevant ads often cost less and see more results. In other words, an ad that's relevant to a person could win an auction against ads with higher bids."[25]

**C.    Facebook's Representations Regarding Advertising On Its Platform**

40. Facebook currently represents to its advertisers that they "will not be charged for clicks that are determined to be invalid."[26]

41. Facebook's declarations regarding advertising on Facebook, which can (and could) be found on its website throughout the Class Period, have effectively and in substance been the same throughout the Class Period:

a.    "You will not be charged for clicks that are determined to be invalid, which Facebook defines as "clicks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook terms."

b.    "Ads help you reach the right people."

c.    "Facebook can help you reach all the people who matter most to your business."

d.    "Facebook Ads are optimized to help you get more people to visit your website or increase conversions."

---

[24] *Id.*

[25] *Id.*

[26] https://www.facebook.com/business/help/211248262238771 (last visited April 9, 2020).

e.     "On Facebook, you'll only pay to reach the right people who'll love your business."

42.     In 2013, when Plaintiff began paying for advertising on Facebook, Facebook made the following representations on its Platform:

a.     "Your business is for your customers.  Build relationships with them, reach new people and drive sales using Facebook."

b.     "Connect with people.  Ads help you reach the right people."

c.     "Drive people to your website with one click from the most engaging place on Facebook."

d.     "Find new customers.  Boost sales.  Facebook can meet your business goals."

43.     In 2014, when Plaintiff was paying for advertising on Facebook, Facebook made the following representations on its Platform:

a.     "On Facebook, you'll only pay to reach the right people who'll love your business."

b.     "Meet the people who will love your business."

c.     "Facebook can help you reach all the people who matter most to your business."

d.     "Drive people to your website with one click from the most engaging place on Facebook."

e.     "Connect with all of the right people on Facebook, so they'll be more likely to click through to your website and convert."

f.     "People see an ad that links to your product or service online.  Customers or prospects click to your website."

g.     "Facebook Ads are optimized to help you get more people to visit your website or increase conversions."

44.     In 2015, when Plaintiff continued to pay for advertising on Facebook, Facebook made the following representations:

a.     "On Facebook, you'll only pay to reach the right people who'll love your business."

b.     "Over 1 billion people.  We'll help you reach the right ones."

c.     "Connect with all of the right people on Facebook, so they'll be more likely to click through to your website and convert."

d.     "People see an ad that links to your product or service online.  Customers or prospects click to your website."

e.     "Facebook Ads are optimized to help you get more people to visit your website or increase conversions."

f.     "Meet the people who'll love your business.  Facebook helps you reach your business goals."

g.     "Marketing on Facebook helps your business build lasting relationships with people and find new customers."

45.     In 2016, when Plaintiff continued to pay for advertising on Facebook, Facebook made the following representations:

a.     "You will not be charged for clicks that are determined to be invalid."

b.     "How does Facebook prevent and detect invalid clicks?  We do a few things to reduce the risk of abuse from invalid clicks and help improve your ad performance like capping the number of times any ad is shown to a person, regardless of whether they click on the ad.  There are two different types of clicks we consider invalid: [1] Clicks from people that don't indicate a genuine interest in the ad or show signs of ad testing.  This includes repetitive or accidental clicks and visits from the Facebook corporate network.  [2] Clicks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook Terms."

c.     "Meet the people who'll love your business.  Facebook helps you reach your business goals."

d.     "Marketing on Facebook helps your business build lasting relationships with people and find new customers."

e.     "Facebook is different from other ways of advertising because you can get your ads to just the right people."

f.      "With Facebook Ads, you can get more people in your store, shop on your website, like your Page, Install your app and more."

g.      "Bring more people to your website from Facebook. When people click your ad, you can send them to any page on your website—including your online store."

h.      "With optimized bidding, we automatically bid for you while staying within your chosen budget and serve your ad to people more likely to take action.  For example, if you run an ad to increase views of your website, we'll serve your ad to people who are more likely to visit your website."

46.      In 2017, when Plaintiff was still paying for advertising on Facebook, Facebook made the following representations:

a.      "Connect with people and grow your business."

b.      "Millions of businesses, big and small, use the Facebook family of apps and services to connect with real people on any device."

c.      "Facebook Pages help people connect with your business.  And Facebook ads help people discover your business."

d.      "Advertising on Facebook makes it easy to find the right people, capture their attention and get results."

e.      "Ads are shown to people likely to be interested, so you get results."

f.      "[A]dvertisers are reaching people receptive to their ads and users are seeing something they're interested in."

47.      In 2018, the last year Plaintiff paid for advertising on Facebook, Facebook made the following representations:

a.      "You will not be charged for clicks that are determined to be invalid."

b.      "How does Facebook prevent and detect invalid clicks?  We do a few things to reduce the risk of abuse from invalid clicks and help improve your ad performance like capping the number of times any ad is shown to a person, regardless of whether they click on the ad.  There are two different types of clicks we consider invalid: [1] Clicks from people that don't indicate a genuine interest in the ad or show signs of ad testing.  This includes repetitive or accidental clicks and visits from the

Facebook corporate network. [2] Clicks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook Terms."

      c.     "Advertising on Facebook makes it easy to find the right people, capture their attention and get results."

      d.     "Make meaningful connections with people to grow your business."

      e.     "Facebook Pages help people connect with your business.  And Facebook ads help people discover your business."

      f.     "Ads are shown to people likely to be interested, so you get results."

      g.     "[A]dvertisers are reaching people receptive to their ads and users are seeing something they're interested in."

48.     From on or about December 1, 2013, through May 1, 2018, Plaintiff read and reviewed various representations by Facebook about advertising on Facebook, including the representations identified in paragraphs 41 through 47 above.

### D.    **Plaintiff's Advertisements on Facebook and Its Review of the Results**

49.     Over the period December 1, 2013 through May 2018, Plaintiff placed fifty-five (55) advertising campaigns for its Facebook account, "DotBuzz" and was billed $8120.16 by Facebook.  All of its advertising campaigns were placed for the promotion of the .buzz domain name registry.  Plaintiff's advertising campaigns were placed with the following objectives: event responses (1 campaign); page likes (1 campaign); video views (1 campaign); conversions (2 campaigns); link clicks (13 campaigns); and the objective for the remainder was post engagement (37 campaigns).

50.     Facebook represented as recently as January 30, 2020, that it "divide[s] 'false' accounts into two categories: (1) user-misclassified accounts, where users have created personal profiles for a business, organization, or non-human entity such as a pet (such entities are permitted on Facebook using a Page rather than a personal profile under our terms of service); and (2) **violating accounts**, which represent user profiles that we believe are intended to be used for purposes that violate our terms of service, such as bots and spam."[27]

---

[27] 2019 10-K at 4 (emphasis added).

51.     Facebooks says that its "estimates of duplicate and false accounts are based on an internal review of a limited sample of accounts, and we apply significant judgment in making this determination. For example, to identify duplicate accounts we use data signals such as identical IP addresses and similar user names, and to identify false accounts we look for names that appear to be fake or other behavior that appears inauthentic to the reviewers."[28]

52.     Based on the criteria set forth in paragraphs 51 and 70-72 below, Plaintiff surveyed approximately seventy (70) accounts through which clicks were generated for which Facebook charged Plaintiff pursuant to its paid advertising campaign and identified several as fake accounts for which Plaintiff paid Facebook.

53.     These fake Facebook accounts which interacted with Plaintiff's advertising campaign and for which interactions Facebook charged Plaintiff and Plaintiff paid Facebook, violate Facebook's "authenticity policy" and Terms of Service because they fail to use the person's real identity and fail to provide accurate information.

### 1.     Sandra Clevenger—Plaintiff's April 1-30, 2016 Ad Campaign "Create Your .BUZZ! Only $19.99 www.godaddy.buzz."

54.     On April 1-30, 2016, Plaintiff ran an advertising campaign with the objective of "post engagement" and was charged $100.00.  The ad campaign ID number was 6059748828013.

55.     "'Post engagement' includes all actions that people take involving your ads while they're running.  Post engagements can include actions such as reacting to, commenting on or sharing the ad, claiming an offer, viewing a photo or video, or clicking on a link."[29]

56.     During this campaign, Plaintiff was charged for actions taken through a Facebook account under the name of Sandra Clevenger (facebook.com/sandra.clevenger.37).   This account has the following indicia of a fake account that violates Facebook's authenticity policy and Terms of Service:

              a.     There is no cover photo.

              b.     The profile picture is that of a model downloaded from the internet.

---

[28] *Id.*

[29] https://www.facebook.com/business/help/735720159834389 (last visited April 28, 2020).

c.      The address is not a real address.  The zip code provided is for Topeka, Kansas, not Kansas, Oklahoma, which is listed as the account holder's hometown.

d.      The account holder claims to have attended the United States Naval Academy, but the name Sandra Clevenger is not found in the United States Naval Academy Alumni Directory.

e.      The account holder claims to have attended the USA High School in London, United Kingdom.  Such a high school does not exist.  There is, however, The American School in London (https://www.asl.org/about).

f.      The account holder claims to work for the United States Navy in Kansas, Oklahoma, which does not have a naval base.

g.      The account holder claims "Usa, Southern Highlands, Papua New Guinea" is her hometown, yet most of her friends are from Romania.

h.      The account holder is following "Victor Alexeev" who appears to be a Romanian politician who "Works at PSD România în Republica Moldova".

i.      The account holder has one friend who also attended "USA High School," Dacey Davies (facebook.com/dacey.b.davies).  The account of Dacey Davies also has indicia of being a fake account.

57.      Plaintiff was wrongly charged for actions taken through a Facebook account under the name of Sandra Clevenger and Facebook has not refunded any of the money Plaintiff paid Facebook for these actions.

### 2.      Akr Tae Tae—Plaintiff's March 1-31, 2016 Ad Campaign "Musicians Have Found a New Way to Generate Buzz . . . ."

58.      On March 1-31, 2016, Plaintiff ran an advertising campaign with the objective of "post engagement" and was charged $472.78.  The ad campaign ID number was 6052980188213.

59.      During this campaign, Plaintiff was charged for actions taken through a Facebook account under the name of Akr Tae Tae (facebook.com/real.stitches.5).  This account has the following indicia of a fake account that violates Facebook's authenticity policy and Terms of Service:

a.      The person depicted in the profile picture is different than the one depicted in the profile video.

b.    The account holder claims to have grown up in Des Moines, Iowa, where he attended high school and currently lives; yet his friends are predominantly Karen People from Asia-Pacific countries, such as Thailand.

c.    The profile picture was last updated on June 14, 2016.

d.    The account holder claims that he works at Facebook App.

e.    The cover photo is a screen shot taken from an Eligible Magazine article titled, "5 Long Distance Love Tips" dated June 7, 2015.

f.    The account holder has a Thai nickname which translates roughly to "I don't have a girlfriend/boyfriend."

g.    The name on the account and the URL are different.

h.    Several of the account holder's friends' Facebook accounts have indicia of being fake accounts, such as Crush EV (facebook.com/profile.php?id=100011621027161).

60.    Plaintiff was wrongly charged for actions taken through a Facebook account under the name of Akr Tae Tae and Facebook has not refunded any of the money Plaintiff paid Facebook for these actions.

### 3.    Missy Scott—Plaintiff's s September 1-October 31, 2017 Ad Campaign "www.JohnnyDarlin.buzz."

61.    On September 1-October 31, 2017, Plaintiff ran an advertising campaign with the objective of "post engagement" and was charged $25.00.   The ad campaign ID number was 6122601485413.

62.    During this campaign, Plaintiff was charged for actions taken through a Facebook account under the name of Missy Scott (facebook.com/profile.php?id=100017903644042).  This account has the following indicia of a fake account that violates Facebook's authenticity policy and Terms of Service:

a.    The profile picture is a stock photograph of a cat that was last updated on June 8, 2017.

b.    The cover photo is a stock photograph of the American flag and Boston Harbor Hotel, Rowes Wharf Building, Boston, Massachusetts and was last updated on June 8, 2017.  This photo can be downloaded from shutterstock.com.

c.     The account holder claims to be from Oakhurst, Florida. There is no such city in Florida. There is an "Oakhurst Shores" neighborhood in Seminole, Florida. The account holder also claims she attended Yosemite High School in Oakhurst, California.

d.     The account holder claims to currently live in the town of "Cambridge Springs, Pennsylvania," yet her friends include a number of people of Arabic, Cambodian, and Indian descent. Cambridge Springs, Pennsylvania is a borough with home rule status in Crawford County, Pennsylvania, United States. The population was 2,595 at the 2010 census.

e.     The name on the account and the URL are different.

f.     Several of the account holder's friend's Facebook accounts have indicia of being fake accounts, such as Kymberly Cotton (facebook.com/profile.php?id=100014465493054).

63.     Plaintiff was wrongly charged for actions taken through a Facebook account under the name of Missy Scott and Facebook has not refunded any of the money Plaintiff paid Facebook for these actions.

**4.     Ratney Shamshad—Plaintiff's September 1-October 31, 2017 Ad Campaign "www.JohnnyDarlin.buzz."**

64.     On September 1-October 31, 2017, Plaintiff ran an advertising campaign with the objective of "post engagement" and was charged $10.96. The ad campaign ID number was 6122601485413.

65.     During this campaign, Plaintiff was charged for actions taken through a Facebook account under the name of Ratney Shamshad (facebook.com/ratney.shamshad.3) This account has the following indicia of a fake account that violates Facebook's authenticity policy and Terms of Service:

a.     The profile picture is a photograph of a woman dressed in a purple prom-like dress. The account holder claims to be a male. The profile picture was updated on August 25, 2017.

b.     The cover photo is a photograph of 2 bearded Boston Bruins fans drinking beer at a Bruins hockey game that was updated on August 25, 2017.

c.     The account holder claims to be from Minco, Oklahoma, but his friends are predominately from India, Afghanistan, and Pakistan.

d. The account holder claims to currently live in Sacramento, California, but none of his friends appear to live in California.

e. Several of the account holder's friends' Facebook accounts have indicia of being fake accounts, such as Brigid Byrd (facebook.com/profile.php?id=100014881020865).

66. Plaintiff was wrongly charged for actions taken through a Facebook account under the name of Ratney Shamshad and Facebook has not refunded any of the money Plaintiff paid Facebook for these actions.

67. Facebook engaged in the wrongful and deceptive conduct alleged above to boost its revenue beyond what it would have otherwise earned solely from legitimately targeted advertising. Even though Facebook has identified millions of fake accounts, it nonetheless charged Plaintiff and the members of the Class for all of the interactions with those fake accounts and has not refunded any monies paid by Plaintiff and the members of the Class after the accounts have been identified as fake, except in the rare cases where the fake accounts were specifically identified by the advertiser.

**5.      Plaintiff's Red Flag Review Identified No Fewer Than Eight Accounts as Fake That Have Since Been Removed**

68. Plaintiff was also charged for actions taken through the following eight (8) Facebook accounts, which were identified by Plaintiff as fake Facebook accounts during the limited "red flag" manual review that Plaintiff performed on or about May 30, 2018, but were also subsequently removed by Facebook likely for violating of its "authenticity policy" and are no longer on the platform:

a. **Account**: facebook.com/**saraicsant**

- Ad campaign dates: March 1-31, 2014

- Ad campaign name: BUZZnames is giving away 7 Nexus 7 Tablets . . .

- Ad campaign ID: 6014218390613

- Amount Facebook charged Plaintiff for campaign: $240.00

b. **Account**: facebook.com/**joann.eddy.71**

- Ad campaign dates: March 1-31, 2014

- Ad campaign name: Our second BUZZnames Launch Contest winner is . . .

- Ad campaign ID: 6014517166613

- Amount Facebook charged Plaintiff for campaign: $15.00

c.   **Account**: facebook.com/**ItsCriz123456**

- Ad campaign cates: April 1-30, 2014
- Ad campaign name: .BUZZ one of the safest places to establish your . . .
- Ad campaign ID: 6015079436413
- Amount Facebook charged Plaintiff for campaign: $30.00

d.   **Account**: facebook.com/**fiah.tuono**

- Ad campaign dates: January 1-31, 2015
- Ad campaign name: 33 .bike domain portfolio up for bid at NamesCon . . .
- Ad campaign ID: 6023234679613
- Amount Facebook charged Plaintiff for campaign: $200.00

e.   **Account**: facebook.com/**joshua.bert.94**

- Ad campaign dates: January 1-31, 2015
- Ad campaign name: 33 .bike domain portfolio up for bid at NamesCon . . .
- Ad campaign ID: 6023234679613
- Amount Facebook charged Plaintiff for campaign: $200.00

f.   **Account**: facebook.com/**joshua.bert.94**

- Ad campaign dates: January 1-31 & February 1-28, 2015
- Ad campaign name: Superbowl Weekend. GoDaddy has .buzz domains on . . .
- Ad campaign ID: 6024044876213
- Amount Facebook charged Plaintiff for campaign: $200.00

g.   **Account**: facebook.com/**T4337TJJ**

- Ad campaign dates: February 1-29, 2016
- Ad campaign name: Married to Paul McCartney's father for 12 years, . . .
- Ad campaign ID: 6048102087413
- Amount Facebook charged Plaintiff for campaign: $42.78

h.   **Account**: facebook.com/**deangelo.wilson.739**

- Ad campaign dates: March 1-31, 2017

- Ad campaign name: Start winning with .buzz domain names, now on . . .
- Ad campaign ID: 6109435633213
- Amount Facebook charged Plaintiff for campaign: $174.82

 i. **Account**: facebook.com/**wookestwook**

- Ad campaign dates: September 1-30, October 1-31, 2017
- Ad campaign name: www.JohnnyDarlin.buzz
- Ad campaign ID: 6122601485413
- Amount Facebook charged Plaintiff for campaign: $25.00

**E.** **How to Spot Facebook's Fake Accounts**

69. A number of articles have been published in a variety of respected publications that identify various red flags that indicate a Facebook account is fake.

70. On November 3, 2017, the *New York Times* published an article entitled, "Facebook Says It's Policing Fake Accounts. But They're Still Easy to Spot." The article set forth the following "red flags" associated with fake or inauthentic accounts:

 a. "Check out who a profile is 'friends' with. Is the hometown listed on a profile similar to its friend base?"

 b. "Compare the profile's public name to its web address."

 c. "If a profile seems suspicious, search for similar pages that draw on the same personal details or images."[30]

71. On November 26, 2018, Vipin Pandey published an article on MalwareFox.com, entitled, "How to Spot Fake Facebook Profile." The article set forth the following "red flags" associated with fake or inauthentic accounts:

 a. "Check: The Profile Picture. The first thing you see in a profile on Facebook is their profile picture. You can tell if a profile is genuine or fake by looking at it. Below are some concerns that you should check with the profile picture.

- Single Profile Picture

---

[30] https://www.nytimes.com/2017/11/03/technology/facebook-fake-accounts.html?searchResultPosition=1 (last visited April 20, 2020)

- Profile Pictures of Celebrities

- No Profile Picture

- A Perfect Profile Picture . . . If you are seeing a picture of a model with a perfect angle and lighting, then it might be a fake one."

b.      "Check: Read the About Section.  Another way to spot a fake Facebook profile is to look on [sic] the about section.  Genuine people on Facebook like to enter their accomplishment [sic] in detail.  They would [sic] adequately list their school, college, previous and current employment, etc.  If you see nothing on [sic] about section, then it might be a fake account.

- Also, when you see lots of pattern like Works in California, Went to the University of California, Lives in California, then it is a sign of a fake account.  Fake account creators don't go into details, they fill [sic] common and famous things to look credible.  It could be the renowned name of famous places like New York, California, Los Angeles, Texas, or it could be the name of famous universities like Harvard University, New York University, Stanford University."

c.      "Check: Friends.  Now it's time to check the friend list; a genuine person would like to connect with more local persons [sic].  When you see so many foreign friends, and no or less local friends, then it could be a fake profile.  If a person is from New York then why would he connect with so many Saudi Arab Emirates persons?

- If it is a girl profile and you see 3-4 K [sic] friends on the list, then it should raise a red flag.  Usually, genuine girls on Facebook don't like unknown people, and they have limited friends.  When you see so many friends, and most of them are fake, then don't accept the friend request and block the person."

d.      "Check: Different Name in URL and Profile.  Many fake Facebook accounts have different names in the URL and the profile.  It happens when a genuine person account is hacked and then operated under another person name, or if the account was created for some other activity, and then they change the name to promote different topics.

- For example, someone creates an account to promote things for American people and then they decided to use the same account to push content to Saudi Arab [sic], so he or she changed the name. However, different name in URL and profile is not a clear indication that account is fake, but if we relate it with other factors, it could be a clear sign."

e.     "Check: Read the Timeline. Now it comes to read the Timeline. If a user is posting too many links of one or many websites with lots of ads, then it is clear that the account is for promotion and it is likely to be a fake account.

- Users on Facebook share different things like jokes, music, video, or pictures. They also share their activity like traveling, reading, listening. If you don't see such different types of posts, then it could also be a sign of fake account. Just scroll the timeline to grasp what users are sharing and compare it with what they were sharing earlier. Shifting of content on the timeline indicates the same."

f.     "Check: Lack of Interactions on the Posts. Now check the profile carefully, click on the pictures and check the likes and comments. When you see so many likes, and generic comments on pictures of girls account like beautiful, cute, sweet, and the account holder hasn't replied to anyone then it is a sign of a fake profile. A genuine person at least thanks people when someone comments on his or her picture.

- Another sign is when you see lots of friends in the friend list, and very few of them like and comment on the posts then it also rings a bell. Click on the More button to see more activity like Check-ins, Music, Films, TV-Programme, etc. If you see no such activity, then the profile is not genuine."[31]

72.     On November 17, 2015, John Lincoln, CEO of Ignite Visibility published an article entitled, "How to Spot a Fake Facebook Account a Mile Away," in which he stated the following with regard to spotting a fake Facebook account:

---

[31] https://www.malwarefox.com/spot-fake-facebook-profile/ (last visited April 22, 2020).

a. "The [Profile] Photo. One of the easiest ways to determine that a Facebook account is fake is by examining the [Profile] photo. It's often the case that fake accounts use a profile photo that they've downloaded from somewhere else online . . . ."

b. "Spot a Fake Facebook Profile by The Number of Photos. Think about your Facebook friends that you know are real. Many of them post lots of photos over time. They'll post pictures of their kids, their extended family members, and funny memes. Fake users rarely post a lot of photos. If you suspect that a Facebook user is fake, check the photostream associated with the account. If there are only a couple of photos, and the account is fairly old, then you can be fairly certain that the account is fake."

c. "The Number of Friends. How many of your real Facebook friends have thousands of friends on Facebook? Chances are, not too many. On the flip side, if the account only has a few friends or zero, that is also a sign. If you see a Facebook account with friends that number into thousands (or less than 10), the account could be fake. However, there are some real Facebook users who have that many friends (or not a lot), so don't be hasty to jump to a conclusion about popular Facebook users."

d. "Recent Activity. Many people who are on Facebook share a common trait: They use Facebook fairly regularly. If you suspect a fake Facebook profile, check the recent activity on the user's wall. If the user is performing various activities from time to time, such as posting updates, adding photos and getting tagged by friends, then it's probably a real account. On the other hand, if the timeline is strangely absent of any type of activity, you're probably looking at a fake Facebook account."

e. "Mutual Friends. If you receive a Facebook friend request from somebody you don't know that alone should be a red flag. However, it's an even larger red flag if the two of you share no mutual friends. Sometimes, people will send Facebook friend requests to people that they share mutual friends with, even if they don't know the user personally. It's your call as to whether or not you want to accept those requests, but it's not a good idea to accept a friend request from 1) somebody you don't know and 2) somebody who shares no mutual friends with you. If both of those situations are true, it's a sign you're receiving an overture from a fake account."

f. "Weird Biography. When you click on somebody's Facebook link, you can see a brief biography about the user on the left-hand side of the page. If the information there seems fishy, it's a sign that the account is a fake. For example, if somebody claims to have been born in Cape Cod, Massachusetts, but went to school in Mumbai, India, and now works for a car repair shop in Tulsa, Oklahoma, then you have a good reason to suspect that account."

g. "Non-Responsiveness. If you think that a Facebook account might be fake, send the user a private message. If you get no response, the account might be a fake. Why? Because fake Facebook accounts are often created by bots that don't send or respond to private messages."[32]

## F.  **Facebook's Fake Accounts**

73.     Facebook acknowledges that "[i]n the fourth quarter of 2019, we estimated that false accounts may have represented approximately 5% of our worldwide MAUs. Our estimation of false accounts can vary as a result of episodic spikes in the creation of such accounts, which we have seen originate more frequently in specific countries such as Indonesia and Vietnam."[33] This is a problem that has plagued Facebook for as long as the platform has been operating.

74.     Based on the existence of these fake accounts, Facebook claims many more users than it actually has, which in turn misleads advertisers to conclude that Facebook is a more attractive advertising medium than in reality it is.

75.     According to Facebook's Terms of Service, authentic Facebook accounts are created by people using their real identities; people who "provide accurate information about [themselves]," and who use "the same name that [they] use in everyday life."[34] In his Senate Judiciary Subcommittee Testimony, Colin Stretch confirmed that in order to create a Facebook account, "a person must first set up a Facebook account — using their real identity."[35]

---

[32] https://ignitevisibility.com/how-to-spot-a-fake-facebook-account-a-mile-away/ (last visited April 22, 2020).

[33] 2019 10-K at p. 4.

[34] *See* https://www.facebook.com/terms.php (last visited April 24, 2020).

[35] https://www.judiciary.senate.gov/imo/media/doc/10-31-17%20Stretch%20Testimony.pdf (Last visited April 30, 2020).

76.     Facebook's fake account problem garnered attention in the mainstream media beginning no later than November 3, 2017 with a *New York Times* article entitled "Facebook Says It's Policing Fake Accounts. But They're Still Easy to Spot."[36] The article reported the following:

a.      "Executives of Facebook, Twitter and Google pledged to Congress this week to do more to prevent the fakery that has polluted their sites. 'We understand that the people you represent expect authentic experiences when they come to our platform,' Colin Stretch, the general counsel of Facebook, told the Senate Intelligence Committee. He said the company was doubling its review staff to 20,000 and using artificial intelligence to find more 'bad actors.'"

b.      "Mr. Stretch, meet Keven S. Eversley. Mr. Eversley's Facebook profile informs us that he is from Minneapolis. But a glance at the web address for his profile reveals a different name: Aleksandar Teovski. And nearly all of his Facebook friends, his family photographs, his alma mater and even his employer are in Macedonia, a center for internet fakery."

c.      "Despite months of talk about the problem of fraud facing Facebook and other tech companies, and vows to root it out, their sites remain infected by obvious counterfeits."

d.      "With more than two billion users worldwide, Facebook relies on complaints to police its content. So, Mr. Elwood used Facebook's internal complaint tool to report the Keven Eversley profile and 27 others showing evidence of deception. In all but a couple of cases, Facebook responded with a standard message of thanks for the feedback but said the profiles did not violate its community standards — even though those standards require users to give their 'authentic identities.'"

e.      "'The reporting process is frustrating,' Mr. Elwood said. 'Facebook seems to be lagging way behind the problem.'"

77.     On May 23, 2019, the *Washington Post* published an article entitled "Facebook removed 3 billion fake accounts over a six-month period."[37] This article stated, in part:

---

[36] Scot Shane, Mike Isaac, *New York Times* (November 2, 2017), Facebook Says It's Policing Fake Accounts. But They're Still Easy to Spot, https://www.nytimes.com/2017/11/03/technology/facebook-fake-accounts.html?searchResultPosition=1 (last visited April 26, 2020).

[37] Tony Romm, *Washington Post*: Tech Policy (May 23, 2019), Facebook removed 3 billion fake accounts over a six-month period, https://www.washingtonpost.com/technology/2019/05/23/facebook-removed-billion-fake-accounts-over-six-month-period/ (last visited April 24, 2020).

a. "Facebook said it had removed more than 3 billion fake accounts between October [2018] and March [2019], a spike in banned activity that underscores the social-networking company's ongoing struggle to clean up its platform."

b. "Facebook said that the billions of accounts it removed over the six-month period, which it attributed to 'unsophisticated' bad actors that are caught while creating spam profiles, were 'never considered active,' so they did not count toward the company's total number of monthly active users. In the first quarter of this year, Facebook reported that it had 2.3 billion monthly active users, a figure that investors track closely to chart Facebook's popularity and growth. Facebook estimates about 5 percent of those active accounts are fake."

c. "In a widely read op-ed published earlier this month, [Chris] Hughes [Facebook Co-founder] had pointed to Facebook's failures in dealing with the viral proliferation of disinformation and other ills as he called on federal antitrust regulators to probe and penalize the social-networking giant."

78. Similarly, a May 23, 2019 article in *The Hill* entitled, "Facebook removes record 2.2 billion fake accounts in first quarter" stated:[38]

a. "Facebook on Thursday said it removed a record 2.2 billion fake accounts from its platform in the first three months of 2019, nearly double the amount it deleted in the previous quarter."

b. "In the fourth quarter of 2018, Facebook removed about 1.2 billion fake accounts from the platform."

c. Facebook estimated that at any given time fake accounts comprise about 5 percent of its 2.4 billion monthly active users.

79. Facebook engaged in the deceptive conduct alleged herein order to increase its revenue beyond what it would have otherwise earned solely from legitimate accounts consistent with its representations.

---

[38] Harper Neidig, The Hill (May 23, 2019), Facebook removes 2.2 billion fake accounts in the first quarter, https://thehill.com/policy/technology/445240-facebook-removes-record-22-billion-fake-accounts-in-first-quarter (last visited April 25, 2020).

80. Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and (b)(3) on behalf of itself and members of the Class, consisting of:

> All persons or entities within the United States who, from December 1, 2013, to the present ("Class Period"), paid Facebook for advertising based on impressions delivered to or actions generated through fake Facebook accounts. Excluded from the Class are Defendant, and its subsidiaries and affiliates; its current and former officers, directors, and employees (and members of their immediate families); and the legal representatives, heirs, successors or assigns of any of the foregoing.

81. Plaintiff reserves the right to amend the Class definition if further investigation and/or discovery reveal that the Class should be expanded, divided into subclasses, or otherwise modified.

82. Pursuant to Federal Rule of Civil Procedure 23(a)(1), the members of the Class are so numerous that joinder of all members is impracticable. As of December 31, 2019, Facebook reported that its average daily active users ("DAUs") were 1.66 billion.

83. Pursuant to Federal Rule of Civil Procedure 23(a)(2) and (b)(3), there are questions of law and fact common to the Class, and those common questions predominate over any questions affecting only individual members. Among the common questions of law and fact include:

- Whether Facebook misrepresented to prospective advertisers that they would only be charged for advertising based on impressions delivered to or actions generated through authentic Facebook accounts;

- Whether Facebook deceived and misled its advertisers by charging advertisers for advertising based on impressions delivered to or actions generated through fake Facebook accounts;

- Whether the misrepresentations and deceptive and misleading practices of Facebook alleged herein violated California's Unfair Competition Law; and

- Whether members of the Class have sustained injury and, if so, what is the proper measure of relief.

84. Pursuant to Federal Rule of Civil Procedure 23(a)(3), Plaintiff's claims are typical of the claims of other members of the Class since Plaintiff and all members of the Class paid for advertising based on impressions delivered to or actions generated through fake Facebook accounts.

85.     Pursuant to Federal Rule of Civil Procedure 23(a)(4), Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has no interests adverse or antagonistic to those of the Class and has retained counsel experienced in complex class action litigation.

86.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the injury suffered by individual Class members may be relatively small, and the expense and burden of individual litigation would therefore make it impossible and/or impracticable for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

87.     Certification of Plaintiff's claims for class action treatment is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Facebook has acted or refused to act on grounds generally applicable to Plaintiff and the Class in failing and refusing to refund to Plaintiff and Class members money paid to Facebook based on interaction with fake accounts, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the Class.

88.     Facebook's records identify its advertisers and what sums they paid to Facebook in connection with their advertisements, and Facebook's software tracks the display of every ad, and what data points led to the display of a particular ad to particular users.  As a result, Plaintiff seeks to represent an ascertainable Class, in that determining membership in the Class can be accomplished through Facebook's own records.

### COUNT I

**Violations of California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, _et seq._**

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     During the Class Period, by reason of the conduct alleged herein, Facebook engaged in fraudulent, unlawful and unfair business practices within the meaning of Section 17200 of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 _et seq._ ("UCL").  The conduct alleged herein is a "business practice" within the meaning of the UCL.

**Fraudulent Practices**

91.     Facebook's misrepresentations that it would deliver ads to genuine followers, and omission to disclose that it was charging advertisers for engagements with fake accounts to maximize its own ad revenue, was likely to deceive advertisers such as Plaintiff and the members of the Class. Such deceptive conduct constituted a fraudulent practice under the UCL, and caused advertisers to pay for ads for which they would not have agreed to pay anything at all had they known the truth about Facebook's misconduct.

92.     Plaintiff suffered injury in fact and has lost money or property as a result of Facebook's violation of the fraudulent practices prong under the UCL. In deciding to start and continue advertising on Facebook, Plaintiff saw and reasonably relied upon representations by Facebook that it would display Plaintiff's ads to real Facebook users.

93.     Facebook knew or had reason to know that Plaintiff regarded, or was likely to regard its representations as important to Plaintiff's decision to advertise on Facebook. Moreover, a reasonable advertiser would have attached importance to those representations in advertising on Facebook. Accordingly, Facebook's misrepresentations that it would display Plaintiff's ad to Facebook users who are potential customers when, in fact, it was also allowing and charging for engagements with advertisements by fake accounts to boost Facebook's own revenue, constituted a fraudulent and deceptive business practice.

94.     As a result of Facebook's deceptive conduct as alleged herein, Plaintiff paid for ads for which it would not have agreed to pay anything at all had it known the truth about Facebook's misconduct. Accordingly, Facebook's deceptive business practices were the immediate cause of Plaintiff's injuries.

95.     As a result, Facebook's deceptive conduct, as alleged herein, violates the UCL's prohibition against "fraudulent" conduct.

**Unfair Practices**

96.     Facebook's deceptive and misleading conduct, as alleged herein, is oppressive, immoral, unethical, and unscrupulous, caused Plaintiff and the Class members substantial injury (given the millions of businesses advertising on Facebook), and violates established public policy against deceptive conduct

by businesses.  Further, it allowed Facebook to have an unfair advantage over competitors who accurately and truthfully represent their ad targeting practices.

97.     Facebook engaged in unfair and deceptive acts and business practices by misrepresenting that it would deliver ads to genuine Facebook users, and then charging for ads that were engaged with by fake accounts in order to maximize its own ad revenue, and lure advertisers to advertise on Facebook rather through Facebook's competitors, such as Google, Yahoo, and Twitter.

98.     Additionally, the justifications or reasons for, or the utility or benefit (if any) of Facebook's unfair and deceptive acts and business practices are substantially outweighed by the significant economic injury and harm that such conduct caused to Plaintiff and members of the Class.

99.     The harm caused by Facebook's deceptive conduct is not one that Plaintiff and members of the Class could have reasonably avoided, given Facebook's representations that its advertisers "will not be charged for clicks that are determined to be invalid."

100.    Plaintiff suffered injury in fact and has lost money or property as a result of Facebook's violation of the unfairness prong of the UCL as herein alleged.

101.    As a result, Facebook's unfair and deceptive acts and business practices, as alleged herein, violate the UCL's prohibition against "unfair" conduct.

## Unlawful Practices

102.    Facebook's deceptive conduct, as alleged herein, violates California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*., because Facebook misrepresented that it would charge only for engagements with an advertisement initiated by genuine Facebook users, and proceeded to charge for engagements with fake Facebook accounts in order to maximize its ad revenue.  As a result, Facebook's representations to advertisers were untrue and misleading, and Facebook knew (or by the exercise of reasonable care should have known) that they were and are untrue and misleading.

103.    Plaintiff suffered injury in fact and has lost money or property as a result of Facebook's violation of the unlawful practices prong of the UCL as alleged herein.

104.    As a result, Facebook's deceptive conduct, as alleged herein, violates the UCL's prohibition against "unlawful" conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, demands judgment against Defendant as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff as the Class Representative, and Plaintiff's counsel as Class Counsel;

B.      Finding and declaring that Defendant's misconduct, as alleged herein, violates the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and other applicable California law as set forth herein;

C.      Awarding restitution of monies Defendant unlawfully obtained from Plaintiff and the Class as a result of Defendant's misconduct alleged herein;

D.      Awarding injunctive and other equitable relief available under applicable law, including without limitation, an order enjoining Defendant from continuing to charge advertisers for engagements with fake accounts;

E.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, attorneys' fees, expenses and other costs; and

F.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  April 30, 2020                    Respectfully submitted,

**CERA LLP**

By: /s/ Thomas C. Bright
Thomas C. Bright

- and -

**THE DAVID HODGES LAW FIRM**
David A. Hodges (*Admitted pro hac vice*)

*Counsel for Plaintiff and the Proposed Class*