ASHLEY M. SIMONSEN (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: +1 (424) 332-4782
Facsimile: +1 (424) 332-4749
Email: asimonsen@cov.com

SIMON J. FRANKEL (Bar No. 171552)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email: sfrankel@cov.com

KATHRYN E. CAHOY (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: + 1 (650) 632-4700
Facsimile: + 1 (650) 632-4800
Email: kcahoy@cov.com

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DOTSTRATEGY, CO., | Civil Case No.: 3:20-cv-00170-WHA |
| Plaintiff, | |
| v. | **DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT** |
| FACEBOOK, INC., | |
| Defendant. | Hearing: July 16, 2020, 8:00 a.m. |
| | Courtroom: 12 (19th Floor) |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION TO DISMISS .................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.     INTRODUCTION AND STATEMENT OF ISSUES ................................................... 1

II.    STATEMENT OF FACTS .................................................................................. 3

    A.     Facebook's Efforts To Combat Fake Accounts ............................................ 3

    B.     Facebook's Disclosures. ......................................................................... 4

    C.     Plaintiff's Use of Facebook's Self-Serve Advertising Services ..................... 6

    D.     Procedural History. ................................................................................ 7

III.   LEGAL STANDARD ...................................................................................... 8

IV.    ARGUMENT .................................................................................................. 9

    A.     Plaintiff Waived Its Claim by Failing To Timely Dispute the Charges at Issue. ... 9

    B.     Plaintiff's Claim Fails To Satisfy Rule 9(b)'s Heightened Pleading Standard. ....10

        1.     Plaintiff Fails To Plead the "Who" and "Where" of the Alleged Fraud....11

        2.     Plaintiff Fails To Plead the "When" of the Alleged Fraud. .....................11

        3.     Plaintiff Fails To Plead the "What" and "How" of the Alleged Fraud ......12

    C.     Plaintiff Fails To State a Claim Under Any Prong of the UCL. ..........................12

        1.     Plaintiff Fails To Plead Reasonable Consumer Deception ......................13

            a)     Mere puffery cannot sustain a UCL claim. .................................14

            b)     Plaintiff fails to identify any untrue statement. ............................14

            c)     Plaintiff was not promised a perfect system. ...............................17

            d)     Any fraudulent-omission theory of UCL liability fails. ................18

        2.     Plaintiff Does Not Allege Unlawful Conduct. .......................................19

        3.     Plaintiff's Claim Fails Under the "Unfair" Prong for Independent Reasons. .................................................................................................20

    D.     Plaintiff Lacks Statutory Standing To Bring a UCL Claim. ..............................22

        1.     Plaintiff Does Not Adequately Allege Actual Reliance ..........................22

        2.     Plaintiff Does Not Adequately Allege Resulting Economic Injury. .........23

    E.     Leave To Amend Should Be Denied. ........................................................24

V.     CONCLUSION ..............................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AmerisourceBergen Corp. v. Dialysist W., Inc.*,
  465 F.3d 946 (9th Cir. 2006) ...................................................................................... 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 8, 13

*Baltazar v. Apple Inc.*,
  2011 WL 6747884 (N.D. Cal. Dec. 22, 2011) (Alsup, J.) ..................................... 14

*Becerra v. Dr. Pepper/Seven Up, Inc.*,
  945 F.3d 1225 (9th Cir. 2019) ......................................................................... 13, 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 8

*Birdsong v. Apple, Inc.*,
  590 F.3d 955 (9th Cir. 2009) .................................................................................. 24

*Boris v. Wal-Mart Stores, Inc.*,
  35 F. Supp. 3d 1163 (C.D. Cal. 2014) (Collins, J.) ............................................... 12

*Carrea v. Dreyer's Grand Ice Cream, Inc.*,
  475 F. App'x 113 (9th Cir. 2012) ........................................................................... 13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ....................................................................................... 20, 21

*Clark v. Hershey Co.*,
  2019 WL 913603 (N.D. Cal. Feb. 25, 2019) (Alsup, J.) ........................................ 11

*Cohen v. Apple Inc.*,
  2020 WL 619790 (N.D. Cal. Feb. 10, 2020) (Alsup, J.) .......................................... 6

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) .................................................................................. 3

*Ebner v. Fresh, Inc.*,
  838 F.3d 958 (9th Cir. 2016) .................................................................................. 13

*In re Facebook PPC Advert. Litig.*,
  2010 WL 3341062 (N.D. Cal. Aug. 25, 2010) (Fogel, J.) .......................... 21, 22, 23

*In re Facebook PPC Advert. Litig.*,
  2010 WL 5174021 (N.D. Cal. Dec. 15, 2010) (Fogel, J.) ....................................... 18

*Free Range Content, Inc. v. Google Inc.*,
  2016 WL 2902332 (N.D. Cal. May 13, 2016) (Freeman, J.).........................................10

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) ...............................................................................13, 17

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
  343 F.3d 1000 (9th Cir. 2003) ...........................................................................14

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) (en banc) ...............................................................12

*Gregory v. Albertson's, Inc.*,
  104 Cal. App. 4th 845 (2002) .............................................................................21

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) (Koh, J.).....................................14, 15, 17

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ...................................................................9, 10, 11

*Kelsey K. v. NFL Enters., LLC*,
  254 F. Supp. 3d 1140 (N.D. Cal. 2017) (Alsup, J.) ...............................................8

*Kelsey K. v. NFL Enters., LLC*,
  2017 WL 3115169 (N.D. Cal. July 21, 2017) (Alsup, J.) ..............................23, 25

*Kent v. Hewlett-Packard Co.*,
  2010 WL 2681767 (N.D. Cal. July 6, 2010) (Fogel, J.).......................................20

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ............................................................................3

*Kwikset Corp. v. Super. Ct.*,
  51 Cal. 4th 310 (2011) ......................................................................................22

*Lavie v. Procter & Gamble Co.*,
  105 Cal. App. 4th 496 (2003) ............................................................................13

*Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*,
  992 F. Supp. 2d 962 (C.D. Cal. 2014) (Walter, J.) .....................................15, 17

*McKenna v. WhisperText*,
  2015 WL 5264750 (N.D. Cal. Sept. 9, 2015) (Grewal, J.)....................................6

*Miron v. Herbalife Int'l, Inc.*,
  11 F. App'x 927 (9th Cir. 2001) ........................................................................20

*Morris v. BMW of N. Am., LLC*,
  2007 WL 3342612 (N.D. Cal. Nov. 7, 2007) (Alsup, J.) .....................................21

*Niranjan v. Bank of Am., N.A.*,
    2013 WL 1701602 (N.D. Cal. Apr. 18, 2013) (Alsup, J.)...............................................12

*Ove v. Gwinn*,
    264 F.3d 817 (9th Cir. 2001) ...................................................................................8, 12

*Resnick v. Hyundai Motor Am., Inc.*,
    2017 WL 1531192 (C.D. Cal. Apr. 13, 2017) (O'Connell, J.) .....................................23

*Rodriguez v. Sony Computer Entm't Am., LLC*,
    801 F.3d 1045 (9th Cir. 2015) ......................................................................................6

*Royal Primo Corp. v. Whitewater W. Indus., Ltd.*,
    2016 WL 1718196 (N.D. Cal. Apr. 29, 2016) (Spero, J.) .............................................5

*Samura v. Kaiser Found. Health Plan, Inc.*,
    17 Cal. App. 4th 1284 (1993) .................................................................................20, 24

*San Miguel v. HP Inc.*,
    317 F. Supp. 3d 1075 (N.D. Cal. 2018) (Davila, J.) ..................................................21

*Shields v. Alere Home Monitoring, Inc.*,
    2015 WL 7272672 (N.D. Cal. Nov. 18, 2015) (Breyer, J.) .........................................11

*Singh v. Google, LLC*,
    2018 WL 984854 (N.D. Cal. Feb. 20, 2018) (Freeman, J.) .........................................24

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    93 Cal. App. 4th 700 (2001) ..................................................................................21, 22

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012) (Battaglia, J.) ................................................23

*Spiegler v. Home Depot U.S.A., Inc.*,
    552 F. Supp. 2d 1036 (C.D. Cal. 2008) (Snyder, J.).................................................22

*Standard Fire Ins. Co. v. Knowles*,
    568 U.S. 588 (2013).......................................................................................................1

*Stuart v. Cadbury Adams USA, LLC*,
    458 F. App'x 689 (9th Cir. 2011) ...............................................................................13

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ......................................................................................12

*United States v. Corinthian Coll.*,
    655 F.3d 984 (9th Cir. 2011) ........................................................................................6

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ........................................................................................3

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ............................................................... 10, 11

*Vitt v. Apple Computer, Inc.,*
    469 F. App'x 605 (9th Cir. 2012) ................................................................ 14

*Wilson v. Frito-Lay N. Am., Inc.,*
    2013 WL 1320468 (N.D. Cal. Apr. 1, 2013) (Conti, J.) ............................... 11

*Woods v. Google, Inc.,*
    2011 WL 3501403 (N.D. Cal. Aug. 10, 2011) (Fogel, J.)............................... 9

**Statutes**

Cal. Bus. & Prof. Code § 17204 ................................................................... 22

Cal. Bus. & Prof. Code § 17200 ................................................................ 2, 8

<u>**NOTICE OF MOTION AND MOTION TO DISMISS**</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:  PLEASE TAKE NOTICE that on July 16, 2020, at 8:00 a.m., defendant in the above-captioned case will and hereby does move to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

Defendant moves for dismissal on the grounds that plaintiff has failed to allege facts sufficient to state a plausible claim for relief or to allege with particularity the averments of fraud underlying its claim.  Defendant seeks an order dismissing the amended complaint with prejudice.[1]

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   INTRODUCTION AND STATEMENT OF ISSUES

Defendant Facebook, Inc.'s self-serve Ads Manager tool offers an easy and effective way for a business of any size to create high-quality advertising campaigns.  To protect the integrity of its platform for both its users and its advertisers, Facebook constantly works to stay ahead of bad actors, some of whom attempt to exploit the platform through the creation of fake user accounts for their own economic gain and fraudulent schemes.

Facebook expends significant resources to prevent and remove from its platform suspected fake profiles created by these bad actors, and to detect and filter click fraud and other invalid engagement with advertisements.  Indeed, plaintiff's own pleading cites Facebook's 10-K for the proposition that the prevalence of fake accounts in Facebook's active user base falls around just five percent.  While Facebook's prevention and detection systems are highly effective, no system is perfect—especially when the people behind this abuse constantly change their tactics to evade detection.

For this reason, Facebook's Self-Serve Ad Terms—which govern plaintiff and other advertisers who elect to use Facebook's Ads Manager tool—do not guarantee perfection.  Although plaintiff scrubbed from its amended complaint all references to those terms, its original complaint conceded that

---

[1]   Facebook's arbitration rights as to any claims asserted by putative members are not yet at issue because those persons are not parties to this action.  *See, e.g.*, *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013) ("[A] nonnamed class member is [not] a party to the class-action litigation *before the class is certified*.").  Facebook reserves its right to move to compel or for a stay pending arbitration under any applicable arbitration agreement with respect to persons who may later assert claims against Facebook, either as named plaintiffs or as absent class members, in this or any other litigation.

they are binding on plaintiff and quoted extensively from key passages. Those passages notified plaintiff that, while Facebook *attempts* to detect and filter certain invalid activity, Facebook is not responsible for fraudulent clicks or other potentially invalid ad engagements that may affect the cost of running ads. The Self-Serve Ad Terms further state that Facebook does not guarantee in every instance that ads will reach their intended targets, and that Facebook does not guarantee the reach or performance of ads. Finally, the terms make binding on the parties Facebook's Community Payments Terms, in which advertisers waive claims relating to transactions unless they notify Facebook of any dispute within thirty days of the charge. This is a standard provision among payment processors and ensures Facebook will be notified of disputes in a timely fashion so it can take action to prevent loss.

Despite this clear contractual language to which plaintiff admittedly agreed, plaintiff now sues Facebook for violation of California Business & Professions Code section 17200 ("UCL") on the theory that Facebook misled plaintiff into believing that plaintiff would not be charged for a handful of actions on its ads across a four-and-a-half-year period from accounts that plaintiff now suspects are fake.

Plaintiff's claim should be dismissed for four independent reasons. *First*, plaintiff waived its claim by failing to dispute the transactions within thirty days of the charges. *Second*, plaintiff identifies a hodgepodge of representations supposedly made by Facebook but alleges virtually no detail regarding the circumstances of those statements, including where or when plaintiff saw them or why plaintiff contends they are deceptive; plaintiff thus fails to meet the heightened pleading standard of Rule 9(b). *Third*, plaintiff fails to state a plausible claim for relief under any prong of the UCL because none of the alleged representations are likely to deceive a reasonable consumer, especially in light of the binding contractual disclaimers. *Fourth*, plaintiff lacks UCL statutory standing because it does not allege actual reliance on any of the representations identified or any economic injury resulting from the alleged conduct when it received exactly what it bargained for. Finally, leave to amend would be futile given the contractual language and plaintiff's marked failures to allege requisite factual detail within plaintiff's knowledge and control, so Facebook requests dismissal with prejudice.

1

## II.   STATEMENT OF FACTS

2

### A.   Facebook's Efforts To Combat Fake Accounts.

3    Facebook provides an online platform that allows its users to connect and share photos, videos,

4    and other content with friends online.  *See, e.g.*, Dkt. 71 (Am. Compl.), ¶ 1.  In addition to social-media

5    services, Facebook also offers advertising services that allow advertisers to design and place ad

6    campaigns through Facebook's platforms.  Facebook generally charges advertisers based on the number

7    of clicks or impressions their ads receive.  *See, e.g., id.*, ¶¶ 6, 8-9 & n.7 (citing Facebook for Business,

8    *How ad billing works on Facebook*, https://www.facebook.com/business/help/716180208457684?id=

9    1792465934137726 (last visited May 21, 2020)). [2]

10   On Facebook and other major advertising platforms, bad actors deploy evolving tactics to try to

11   profit from fraudulent advertising traffic.  Fraudsters may, for example, attempt to generate clicks on ads

12   "through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that

13   don't follow Facebook terms."  *See id.*, ¶¶ 9 n.8, 40 n.26, 41(a) (citing and quoting Facebook for

14   Business, *About Facebook's detection and prevention of invalid clicks*, https://www.facebook.com/

15   business/help/211248262238771 (last visited May 21, 2020)).

16   As plaintiff acknowledges, Facebook has a system in place for users to report suspected fake

17   accounts and for Facebook to determine whether a given account is likely fake.  Plaintiff recognizes that

18   whether an account is determined to be fake is based on Facebook's internal review, and Facebook

19   applies significant judgment in making this determination.  *See id.*, ¶ 51.  Facebook relies on complaints,

20   among other technological tools, to police accounts, but a user complaint, without more, does not

21

22   [2]     In considering a motion to dismiss, courts "may consider materials incorporated into the
23   complaint," *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010), which here include the
     Self-Serve Ad Terms and various webpages referenced and relied on throughout plaintiff's pleadings.
24   "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint
     if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's
25   claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Moreover, incorporation-by-
     reference permits courts "to consider documents in situations where the complaint necessarily relies
26   upon a document or the contents of the document are alleged in a complaint, the document's authenticity
     is not in question and there are no disputed issues as to the document's relevance," regardless of whether
27   the plaintiff explicitly alleges the contents of that document in the complaint.  *Coto*, 593 F.3d at 1038;
     *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).
28

necessarily lead to Facebook determining that an account is fake. For example, Facebook may disagree with a reporting user that a complained-of account violates Facebook's standards. *See, e.g.*, *id.*, ¶ 76(d).

Combatting advertising fraud, both on Facebook and other advertising platforms, remains "an ongoing challenge" that evolves alongside modern technology. *See, e.g.*, *id.*, ¶ 75 n.35. Facebook, for its part, expends substantial effort combating ad fraud, including by implementing systems and processes that attempt to detect and remove fake accounts. *See, e.g.*, *id.* Although Facebook's methods are highly effective, no system is one hundred percent effective against the possibility of fraud from fake accounts. *See, e.g.*, Facebook for Business, *About Facebook's detection and prevention of invalid clicks* (cited and quoted at Dkt. 71, ¶¶ 9 n.8, 40 n.26, 41(a)).

### B.   Facebook's Disclosures.

Although Facebook constantly works to refine its technology and systems for detecting and filtering fake accounts to keep up with evolving third-party tactics, Facebook discloses to advertisers that it does not warrant perfection. Facebook's Self-Serve Ad Terms—a written contract incorporated into Facebook's Terms of Use and that the original complaint admitted is binding on plaintiff—disclose that Facebook is not responsible for click fraud, technological issues, or other potentially invalid activities on ads. *See* Dkt. 2 (Compl.), ¶¶ 29-31, 40-41, 47, 121, 145, 152-53, 155-58, 165, 310-11.

Section 9 of the Self-Serve Ad Terms (repeatedly quoted in plaintiff's original complaint) states:

> We cannot control how clicks are generated on your ads. We have systems that attempt to detect and filter certain click activity, but we are not responsible for click fraud, technological issues, or other potentially invalid click activity that may affect the cost of running ads.

("click disclaimer"). Declaration of Ashley Simonsen ("Simonsen Decl."), ¶ 2, Ex. 1. Section 1 of the Self-Serve Ad Terms further states:

> When serving your ad, we use best efforts to deliver the ads to the audience you specify or to achieve the outcome you select, though we cannot guarantee in every instance that your ad will reach its intended target or achieve the outcome you select.

("best-efforts disclaimer"). *Id.*, ¶ 2, Ex. 1. And section 8 of the Self-Serve Ad Terms states: "We do not guarantee the reach or performance that your ads will receive, such as the number of people who will see your ads or the number of clicks your ads will get." *Id.*, ¶ 2, Ex. 1.

In addition, section 4(a) of the Self-Serve Ad Terms incorporates and requires advertisers to comply with Facebook's Community Payments Terms. *Id.*, ¶¶ 2, 6, Ex. 1. Section 4.3 of the Community Payments Terms, in turn, states:

> If you believe that an unauthorized or otherwise problematic transaction has taken place under your account, you agree to notify us immediately, so that we may take action to prevent financial loss. Unless you submit the claim to us within 30 days after the charge, you will have waived, to the fullest extent permitted by law, all claims against us arising out of or otherwise related to the transaction.

("duty to notify" provision). *Id.*, ¶ 5, Ex. 2.[3]

Although plaintiff scrubbed all direct mentions of the Self-Serve Ad Terms from its amended complaint, they are easily accessible through other Facebook pages, including the Terms of Service, that are cited and quoted throughout the amended complaint. *See, e.g.*, Dkt. 71, ¶¶ 2, 29 n.17, 50, 53, 56, 59, 62, 65, 75 n.34; Simonsen Decl., ¶¶ 3-4.[4]

---

[3]   This motion quotes from the current version of the Self-Serve Ad Terms, effective May 25, 2018, because that is the version quoted and linked in plaintiff's original complaint. *See* Dkt. 2, ¶ 31 (citing Self-Serve Ad Terms; filed July 10, 2018). Although not necessary for purposes of the instant motion given plaintiff's acknowledgment that the current version applies to plaintiff, *see id.*, ¶¶ 29-31, 40-41, 47, 121, 145, 152-53, 155-58, 165, 310-11, Facebook notes that the Self-Serve Ad Terms underwent several revisions from December 1, 2013, through May 2018. Every version of the best-efforts disclaimer appeared in Section 1 and had the same or substantially similar language as that reproduced above; prior versions stated, "When serving your ad, we do our best to deliver the ads to the audience you specify, although we cannot guarantee in every instance that your ad will reach its intended target." Every version of the click disclaimer had the same language as that reproduced above, though its location in the document changed slightly over time. The language in section 8 previously appeared in sections 6 and 7 and stated, "We do not guarantee the activity that your ads will receive, such as the number of clicks your ads will get." The language incorporating the Community Payments Terms previously appeared in section 3 and stated, "You will pay for your Orders in accordance with our [Community] Payments Terms." And every version of the Community Payments Terms, previously titled "User Payments Terms," contained the same language in section 4.3 as that reproduced above.

[4]    "The principle that a court may look to prior pleadings in determining the plausibility of an amended complaint is well established." *Royal Primo Corp. v. Whitewater W. Indus., Ltd.*, 2016 WL 1718196, at *3 (N.D. Cal. Apr. 29, 2016) (Spero, J.). "[T]he court may . . . consider the prior allegations as part of its 'context-specific' inquiry based on its judicial experience and common sense to assess whether an amended complaint plausibly suggests an entitlement to relief." *McKenna v. WhisperText*, 2015 WL 5264750, at *3 (N.D. Cal. Sept. 9, 2015) (Grewal, J.); *see also, e.g.*, *Rodriguez v. Sony Computer Entm't Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015) (finding plaintiff's "artful[] pleading . . . unconvincing, especially considering that the more recent pleading completely contradicts the earlier

C.    Plaintiff's Use of Facebook's Self-Serve Advertising Services.

From December 1, 2013, through May 2018, plaintiff allegedly used Facebook's self-serve advertising tools to place 55 promotional ad campaigns costing $8,120.16 in total. Dkt. 71, ¶¶ 29-30, 49. Plaintiff does not dispute that the vast majority of charges for its ads came from "real" or "genuine" Facebook users. Rather, Plaintiff identifies only thirteen instances of suspected fake account activity involving only twelve Facebook accounts. *See id.*, ¶¶ 54-68.

Plaintiff admits that Facebook did not charge advertisers or deny refunds in cases where "fake accounts were *specifically* identified by the advertiser," *e.g.*, in a user complaint or refund request. *See id.*, ¶ 67 (emphasis added). Despite this, Plaintiff does not allege that it asked Facebook to review the thirteen charges specifically complained of in the amended complaint or any other specific instances of suspected click fraud, much less that it requested refunds for any specific charges. To the contrary, the original complaint alleged that plaintiff contacted Facebook once in June 2018 to express generalized concerns about "fake account activity," but that message—reproduced in the original complaint and conspicuously omitted from the amended complaint—did not identify any specific accounts that plaintiff wanted Facebook to review, or for which plaintiff sought a refund. Dkt. 2, ¶¶ 71-72.

Plaintiff also identifies dozens of statements allegedly made by Facebook at some point between December 2013 and May 2018. *See* Dkt. 71, ¶¶ 40-48. Most of these statements appear to be simple promotional slogans such as, "Ads help you reach the right people"; "Meet the people who will love your business"; and "Over 1 billion people. We'll help you reach the right ones." *E.g.*, *id.*, ¶¶ 41(b), 43(b), 44(b). Others generally say something to the effect that Facebook can help advertisers like plaintiff improve outreach and grow their businesses—help that plaintiff does not dispute receiving. For example, plaintiff identifies the following statements: "Facebook Ads are optimized to help you get

---

pleading"); *United States v. Corinthian Coll.*, 655 F.3d 984, 995 (9th Cir. 2011) (amended complaint should provide "additional allegations that are 'consistent with the challenged pleading' and that do not contradict the allegations in the original complaint"). Alternatively, the doctrine of incorporation-by-reference also permits consideration of the Self-Serve Ad Terms on the instant motion. *See supra*, footnote 2; *Cohen v. Apple Inc.*, 2020 WL 619790, at *1 (N.D. Cal. Feb. 10, 2020) (Alsup, J.) ("The doctrine prevents plaintiffs from cherry-picking portions of documents that support their claims, while omitting portions of the same documents that weaken their claims.").

more people to visit your website or increase conversions"; "Connect with all of the right people on Facebook, so they'll be more likely to click through to your website and convert"; and "People see an ad that links to your product or service online.  Customers or prospects click to your website." *E.g.*, *id.*, ¶¶ 41(d), 43(e), 44(d).  And in each instance, as discussed further below, plaintiff provides virtually no details about the specific circumstances surrounding when, where, or how plaintiff saw, let alone relied on, these supposed representations.

### D.   Procedural History.

Plaintiff originally filed this case in Arkansas state court on July 10, 2018.  Dkt. 1 at 1. Facebook removed to federal court in Arkansas on September 4, 2018.  *Id.*  The same day, plaintiff moved for default judgment, Dkt. 3, even though it never properly served Facebook, *see* Dkt. 9.  A dispute over plaintiff's service of process then ensued.  Plaintiff filed a motion for jurisdictional discovery on September 14, 2018, and a motion to remand on October 3, 2018.  Dkts. 10, 15.  The Arkansas district court denied all of plaintiff's motions, *see* Dkts. 31, 41, but allowed plaintiff until December 31, 2019, to serve the complaint on Facebook.  Dkt. 42.[5]

On December 19, 2019, Facebook filed an unopposed motion to transfer the case to this district, Dkt. 43, which was granted on January 7, 2020, Dkt. 45.  The parties agreed that Facebook would be deemed to have been served with the complaint as of the date on which the Eastern District of Arkansas granted the motion to transfer.  The case was reassigned to this Court on January 28, 2020.  Dkt. 55.

On April 30, 2020, plaintiff filed an amended complaint, which removed all direct references to the Self-Serve Ad Terms and any mention of the sole direct communication plaintiff allegedly sent to Facebook before filing the instant action.  The amended complaint asserts a single claim for violation of the UCL, which prohibits any "unlawful, unfair[,] or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Plaintiff styles this claim as arising under each of the UCL's three disjunctive

---

[5]      Two weeks after filing this action, Plaintiff filed a similar lawsuit against Twitter, Inc., which was assigned to Judge Charles Breyer following transfer to this district from Arkansas. *See dotStrategy, Co. v. Twitter Inc.*, Case No. 3:19-cv-06176-CRB, Dkt. 1 at 1 (Sept. 21, 2018).  Like this lawsuit, that one accuses Twitter of charging advertisers for engagements from fake accounts. *Id.*, Dkt. 58, ¶¶ 2, 18 (Mar. 6, 2020).  Twitter has moved to dismiss the amended complaint. *See id.*, Dkt. 65 (May 4, 2020).

prongs, but under any prong, the gravamen of the amended complaint remains that Facebook engaged in allegedly fraudulent or deceptive business practices.[6]

## III.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when its factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

While allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party, conclusory assertions and unwarranted inferences are insufficient to defeat a motion to dismiss. *Ove v. Gwinn*, 264 F.3d 817, 821 (9th Cir. 2001). For example, a "formulaic recitation of the elements" of a claim is not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681. And where a plaintiff's allegations actually disprove or demonstrate the implausibility of the asserted claim, dismissal is proper. *See, e.g.*, *Twombly*, 550 U.S. at 570 (a complaint that fails to nudge "claims across the line from conceivable to plausible . . . must be dismissed"); *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1147 (N.D. Cal. 2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018) (Alsup, J.) (dismissing antitrust complaint that failed "to nudge the overall [claim] across the line from *conceivable to plausible*" because it "either lack[ed] sufficient supporting factual allegations or allege[d] facts tending to weigh against a finding of" liability).

In addition, a plaintiff alleging claims sounding in fraud "must state with particularity the circumstances constituting fraud." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)

---

[6]   *See, e.g.*, Dkt. 71, ¶¶ 19 (describing suit as "[b]ased on Facebook's deceptive and misleading promotion of its promise that users would only be charged for impressions delivered to, or actions generated through authentic accounts, and its deceptive and misleading practice of charging for impressions delivered to, and actions generated through fake accounts to maximize its revenue"), 83 (identifying "common questions of law and fact" based on Facebook's alleged "misrepresentations and deceptive and misleading practices"), 91-95 (invoking "fraudulent" prong), 96-101 (invoking "unfair" prong as to Facebook's allegedly "deceptive and misleading conduct"), 102-04 (invoking "unlawful" prong as to Facebook's allegedly "deceptive conduct").

(citing Fed. R. Civ. P. 9(b)). To that end, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* "Any averments which do not meet that standard should be 'disregarded,' or 'stripped' from the claim for failure to satisfy Rule 9(b)." *Id.* Rule 9(b) applies with particular force where, as here, the case does not involve an unsophisticated consumer purchasing a product, but rather involves one sophisticated actor contracting for the service of another business entity. *See, e.g.*, *Woods v. Google, Inc.*, 2011 WL 3501403, at *9 (N.D. Cal. Aug. 10, 2011) (Fogel, J.) ("In light of Woods' sophistication as an attorney and the complaint's lack of particularity with respect to the statements that were alleged to have induced his reliance, the Court concludes that Woods has not alleged facts sufficient to support such a claim.").

## IV.   ARGUMENT

The amended complaint should be dismissed for four independent reasons. *First*, plaintiff waived its claim by failing to dispute the transactions at issue within thirty days of the charges. *Second*, the amended complaint does not meet Rule 9(b)'s heightened pleading standard that averments of fraud be pled with particularity; indeed, the amended complaint omits key facts and obfuscates key details, including several that are within plaintiff's exclusive knowledge and control. *Third*, plaintiff fails to state a plausible claim under any of the fraudulent, unlawful, or unfair prongs of the UCL. *Fourth*, plaintiff lacks standing to bring a UCL claim because it does not allege actual reliance on the alleged misrepresentations or resulting economic injury.

### A.   Plaintiff Waived Its Claim by Failing To Timely Dispute the Charges at Issue.

As plaintiff admitted in its original complaint, it agreed to and remains bound by the Self-Serve Ad Terms. *See, e.g.*, Dkt. 2, ¶¶ 28-31. Those terms specify that plaintiff "will comply with [Facebook's] Community Payments Terms to the extent applicable," Simonsen Decl., Ex. 1 § 4(a), including the "duty to notify" provision therein. *See supra*, Part II(B). That provision required plaintiff to "notify [Facebook] immediately" if it believed "an unauthorized or otherwise problematic transaction ha[d] taken place under [its] account" so that Facebook could "take action to prevent financial loss." Simonsen Decl., Ex. 2 § 4.3. Failure to submit a claim to Facebook "within 30 days after the charge . . . waive[s], to the fullest extent permitted by law, all claims against [Facebook] arising out of or otherwise related to the transaction." *Id.*

Plaintiff does not allege that it ever complied with this provision for any of the charges complained of in the amended complaint. Moreover, the amended complaint conspicuously omits the communication between plaintiff and Facebook alleged in the original complaint, when plaintiff contacted Facebook in June 2018 to express generalized concerns about "fake account activity" but flagged no specific charges for Facebook to review and requested no refunds. *See* Dkt. 2, ¶¶ 71-72. These omissions are underscored by the amended complaint's allegation that—contrary to plaintiff's entire theory of liability—Facebook did not issue charges or deny refunds to advertisers in cases "where the fake accounts were *specifically* identified by the advertiser" and determined by Facebook to be fake. *See* Dkt. 71, ¶ 67 (emphasis added).[7]

In short, plaintiff does not allege that it complied with the "duty to notify" provision of the Community Payments Terms. Thus, even if plaintiff otherwise stated a viable UCL claim for the complained-of charges (which, as explained further below, it has not), plaintiff has waived any such claim against Facebook "arising out of or otherwise related to" those charges. On this basis alone, the amended complaint should be dismissed with prejudice. *See Free Range Content, Inc. v. Google Inc.*, 2016 WL 2902332, at *13 (N.D. Cal. May 13, 2016) (Freeman, J.) (dismissing "all payment-related claims" by plaintiffs because their "failure to comply with [a similar term] bars claims in their entirety").

### B. Plaintiff's Claim Fails To Satisfy Rule 9(b)'s Heightened Pleading Standard.

Where, as here, the plaintiff complains of allegedly "fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of [its] claim," "the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading as a whole must satisfy the particularity requirement of Rule 9(b)." *Kearns*, 567 F.3d at 1125; *see also, e.g.*, *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) ("When an entire complaint, or an entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint or claim."); *Clark v. Hershey Co.*, 2019 WL 913603, at *4 (N.D. Cal. Feb. 25, 2019)

---

[7]    In fact, as plaintiff is aware, the rest of plaintiff's 2018 correspondence with Facebook shows that Facebook responded and asked plaintiff to provide specific examples of what it believed to be fraudulent results on its account so that Facebook could look into them. When plaintiff did not respond, Facebook followed up. When plaintiff still did not respond, Facebook closed the message thread.

1    (Alsup, J.) ("Plaintiffs' claims under [the UCL] should be analyzed within the heightened pleading

2    standard of Rule 9(b), as plaintiffs allege deception and fraud throughout their complaint.").

3        Every purported misrepresentation referenced in the amended complaint fails to satisfy this

4    pleading requirement and therefore must be stripped from the claim.  *Kearns*, 567 F.3d at 1124.

5                    **1.    Plaintiff Fails To Plead the "Who" and "Where" of the Alleged Fraud.**

6        Plaintiff's claim relies on 45 statements that the amended complaint purports to quote verbatim

7    and attributes to Facebook's website generally.  These alleged statements are compiled in a section

8    prominently titled, "Facebook's Representations Regarding Advertising On Its Platform."  Dkt. 71, ¶¶

9    40-48.  Yet most of these statements come with no citation at all.  Without more detail regarding who

10   made the statements and where on Facebook's website plaintiff saw them, Facebook has no fair notice

11   of the statements on which plaintiff bases its claim or the context in which they were made.  That alone

12   is sufficient to dismiss plaintiff's claim.  *See Vess*, 317 F.3d at 1107 (affirming dismissal under Rule

13   9(b) because plaintiff "does not identify any specific misrepresentations or specify when and where they

14   occurred"); *Shields v. Alere Home Monitoring, Inc.*, 2015 WL 7272672, at *6 (N.D. Cal. Nov. 18, 2015)

15   (Breyer, J.) (plaintiff's claims failed under Rule 9(b) because plaintiff did not state "where or when he

16   saw or heard" alleged misrepresentation);  *Wilson v. Frito-Lay N. Am., Inc.*, 2013 WL 1320468, at *5

17   (N.D. Cal. Apr. 1, 2013) (Conti, J.) (dismissing claims under Rule 9(b) when plaintiffs failed to allege

18   detail regarding "the advertisements and websites they frequently quote to support their claims").

19                   **2.    Plaintiff Fails To Plead the "When" of the Alleged Fraud.**

20       While plaintiff generally specifies the calendar years in which Facebook allegedly made the

21   complained-of statements, plaintiff fails to identify with particularity when Facebook made the alleged

22   statements or when plaintiff saw them.  This vague pleading gives Facebook no fair notice as to the

23   specific circumstances of the alleged fraud, including, for example, plaintiff's allegations that it relied

24   on Facebook's supposed misrepresentations.  Simply alleging that plaintiff saw a laundry list of

25   representations at some point during a four-and-a-half year period, without more, does not satisfy Rule

26   9(b).  *See, e.g.*, *Kearns*, 567 F.3d at 1126 (plaintiff that alleges a misleading statement but fails to

27   "specify who made this statement or when this statement was made" "fails to give [defendant] the

28   opportunity to respond to the alleged misconduct" as required by Rule 9(b)); *Boris v. Wal-Mart Stores*,

*Inc.*, 35 F. Supp. 3d 1163, 1174 (C.D. Cal. 2014), *aff'd*, 649 F. App'x 424 (9th Cir. 2016) (Collins, J.) (dismissing complaint for failure to satisfy Rule 9(b) when plaintiff did "not specify when he viewed [defendant's] website or when he relied on it in deciding to buy [the product]").

### 3. Plaintiff Fails To Plead the "What" and "How" of the Alleged Fraud.

In addition to an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations," *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007), a plaintiff "must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). The amended complaint is replete with claims about what Facebook supposedly said or did (or did not do), but never actually alleges *facts* suggesting that Facebook's actions contradicted any of its alleged representations. For most of the statements at issue, plaintiff does not even attempt an explanation of how the statement purportedly deceived plaintiff. Although plaintiff repeatedly describes Facebook's conduct as "fraudulent," "deceptive," "misleading," and "untrue," these are characterizations, not facts, and colorful adjectives are not a substitute for proper pleading. *See, e.g.*, Dkt. 71, ¶¶ 91, 96, 102; *see also Ove*, 264 F.3d at 821 (unwarranted inferences and legal conclusions that are unsupported by factual allegations are not entitled to the presumption of truth).

The problem remains that, as explained further below, none of the *facts* averred by plaintiff support any plausible inference that Facebook's alleged statements or conduct constituted deception or fraud. *See infra*, Part IV(C)(1). As this Court has said, it "will not infer fraud where it has not been stated." *Niranjan v. Bank of Am., N.A.*, 2013 WL 1701602, at *5 (N.D. Cal. Apr. 18, 2013) (Alsup, J.).

### C. Plaintiff Fails To State a Claim Under Any Prong of the UCL.

Taking aim with buckshot rather than relying on any principled distinctions, plaintiff includes boilerplate invocations of every UCL prong in its amended complaint. Regardless of legal dressing, plaintiff's core theory remains that Facebook engaged in allegedly fraudulent business practices, and plaintiff's claim rises or falls on the plausibility of that theory. In these circumstances, all three prongs of the UCL—as well as the False Advertising Law ("FAL") that plaintiff seeks to invoke for its

1  "unlawful" UCL claim—require plaintiff to plead that a reasonable consumer would be deceived by the

2  alleged misrepresentations. The complaint does not clear this bar.

### 1. Plaintiff Fails To Plead Reasonable Consumer Deception.

4  In cases alleging deceptive conduct under any of the three prongs, the UCL requires a plaintiff to

5  show that reasonable members of the public are likely to be deceived by the complained-of conduct.

6  *E.g.*, *Becerra v. Dr. Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228 (9th Cir. 2019) (affirming dismissal of

7  UCL, FAL, and Consumers Legal Remedies Act claims); *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th

8  Cir. 2016) (same); *accord Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995); *Lavie v. Procter &*

9  *Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003). Plaintiff must allege more than a mere possibility that

10  the alleged misrepresentation "might conceivably be misunderstood by some few consumers viewing it

11  in an unreasonable manner." *Lavie*, 105 Cal. App. 4th at 508. Rather, plaintiff must show a probability

12  "that a significant portion of the general consuming public or of targeted consumers, acting reasonably

13  in the circumstances, could be misled." *Id.*

14  Whether plaintiff's claim satisfies the "reasonable consumer test" must be evaluated in light of

15  the court's judicial experience and common sense. *See Iqbal*, 556 U.S. at 679; *Stuart v. Cadbury Adams*

16  *USA, LLC*, 458 F. App'x 689, 690 (9th Cir. 2011) (affirming dismissal of UCL claim where allegations

17  about what a "reasonable consumer" would believe "def[ied] common sense"). When allegations about

18  what a "reasonable consumer" would believe are "implausible" and "strain[] credulity," they warrant

19  dismissal. *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 F. App'x 113, 115 (9th Cir. 2012), *disagreed*

20  *with on other grounds by Hawkins v. Kroger Co.*, 906 F.3d 763 (9th Cir. 2018) (affirming dismissal of

21  UCL claim with prejudice).

22  None of the alleged misrepresentations cited in the amended complaint support a plausible

23  inference of reasonable consumer deception. *First*, most amount to non-actionable puffery, reflecting

24  promotional slogans with no measurable representation of fact. *Second*, all of the identified statements

25  are true on their face; plaintiff's failure to allege facts that would show otherwise dooms its claim.

26  *Third*, to the extent that plaintiff resorts to an inference that Facebook claimed that its mechanism for

27  preventing and detecting fake accounts would be one hundred percent effective, that inference is

28

outright inconsistent with the language of the contract to which plaintiff admittedly agreed. *Fourth*, Plaintiff has not alleged any facts to support a fraud-by-omission theory of UCL liability.

### a)   Mere puffery cannot sustain a UCL claim.

Many of the statements alleged in the amended complaint appear to reflect promotional slogans that merely market Facebook's products and services generally, such as: "Ads help you reach the right people"; "Find new customers. Boost sales. Facebook can meet your business goals."; "Meet the people who will love your business"; "Over 1 billion people. We'll help you reach the right ones"; and "Connect with people and grow your business." Dkt. 71, ¶¶ 41(b), 42(d), 43(b), 44(b), 46(a).

Plaintiff never explains how these general statements amount to actionable misrepresentations. Nor can it; "California courts have . . . held that 'mere puffing' cannot support liability under California consumer protection law." *Vitt v. Apple Comput., Inc.*, 469 F. App'x 605, 607 (9th Cir. 2012). For this reason, courts routinely dismiss UCL claims based on similar promotional slogans, and the same result should obtain here. *See, e.g.*, *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1015 (9th Cir. 2003) (statements that "were generalized, vague and unspecific assertions" constituted "mere 'puffery' upon which a reasonable consumer could not rely"); *Baltazar v. Apple Inc.*, 2011 WL 6747884, at *4 (N.D. Cal. Dec. 22, 2011) (Alsup, J.) (promotional statement that "the iPad can be used 'just like a book'" amounted to mere puffery and reliance on such a statement was not reasonable).

### b)   Plaintiff fails to identify any untrue statement.

Plaintiff's complaint further suffers from the fundamental problem that not one of the alleged representations on which plaintiff bases its claim is false. Where, as here, a plaintiff "does not contest that [a statement] [was] factually true" on its face, it cannot state a plausible claim for relief. *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1092 (N.D. Cal. 2017) (Koh, J.).

*First*, the amended complaint contains multiple allegations to the effect that Facebook said its advertising services could help grow plaintiff's business by connecting plaintiff's ads to people who might be interested in plaintiff's products and services. For example, plaintiff identifies the following alleged statements: "Facebook Ads are optimized to help you get more people to visit your website or increase conversions"; "People see an ad that links to your product or service online. Customers or prospects click to your website"; and "Bring more people to your website from Facebook. When people

click your ad, you can send them to any page on your website—including your online store." *E.g.*, Dkt. 71, ¶¶ 41(d), 43(f), 45(g); *see also* Dkt. 71, ¶¶ 5-6, 25, 29, 35-39, 41(b)-(c), 42(a)-(d), 43(b)-(g), 44(b)-(g), 45(b)-(h), 46(a)-(f), 47(c)-(g), 91-93, 97, 102.

But plaintiff alleges no facts indicating that any of these statements was misleading in any way. For example, plaintiff never alleges that Facebook did *not* help grow plaintiff's business, or that Facebook did *not* connect plaintiff's advertisements to any people. Nor does plaintiff explain how statements that appear factually true on their face, and that plaintiff does not dispute to be true, could be misleading to a reasonable consumer. Accordingly, they cannot form the basis for a plausible UCL claim. *See Hadley*, 243 F. Supp. at 1092; *see also Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 976 (C.D. Cal. 2014) (Walter, J.) ("Plaintiff cannot state a UCL claim based on fraud because Plaintiffs have failed to identify any untruthful statement made by [defendant].").

*Second*, the amended complaint contains multiple allegations to the effect that Facebook said it *tries* to detect and filter out fake accounts. *See* Dkt. 71, ¶¶ 7, 15, 26, 45(b), 47(b), 50. Again, plaintiff does not explain how this was misleading in any way. In fact, the amended complaint incorporates multiple quotes expressly stating that Facebook expends substantial effort preventing and removing accounts that it determines to be fake. *See, e.g., id.*, ¶¶ 10-13 (quoting Senate testimony that Facebook "block[s] millions of attempts to register fake accounts every day"), 51 (describing Facebook's "internal review" process), 76(a) (quoting media coverage of Facebook's authentication efforts), 77-78 (same). Further underscoring the effectiveness of Facebook's efforts, plaintiff cites Facebook's public statements that put the prevalence of fake accounts in Facebook's active user base around just *five percent*. *See id.*, ¶¶ 15, 73. Indeed, plaintiff's own alleged manual review found only thirteen instances of suspected click fraud across a self-selected sample of seventy accounts over four-and-a-half years of advertising on Facebook. *See id.*, ¶¶ 49-68.

*Third*, the remaining allegations relate to statements to the effect that Facebook said plaintiff would "not be charged for clicks that are determined to be invalid." *See id.*, ¶¶ 2, 9, 19, 40 & n.26, 41(a), 41(e), 43(a), 44(a), 45(a), 47(a). Based on these statements, plaintiff accuses Facebook of fraud for supposedly charging plaintiff for engagements from fake accounts. *See id.*, ¶¶ 2, 16-17, 22, 57, 60, 63, 66-67, 87. As a threshold matter, plaintiff waived this claim by failing to contest any specific

charges within thirty days of incurring them. *See supra*, Part IV(A). But leaving that aside, plaintiff's *factual* allegations are notably lacking in several key respects necessary to support this accusation.

The amended complaint recognizes that the determination of whether or not an account is "fake" is based on Facebook's "internal review," including, among other things, Facebook's application of "significant judgment" in making the final determination. *See* Dkt. 71, ¶ 51; *see also id.*, ¶ 16 (describing accounts at issue as those "Facebook determines to be fake"). In making this determination, Facebook considers user complaints submitted through its "internal complaint tool"; but a user's belief that an account is "fake" is not a substitute for Facebook's determination. *See id.*, ¶ 76(d) (quoting article explaining that "Facebook relies on complaints to police its content" but may disagree with users and determine that an account is not "fake" notwithstanding a complaint). As a Facebook webpage cited in the amended complaint explains, "If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity." *See id.*, ¶ 40 n.26 (citing Facebook for Business, *About Facebook's detection and prevention of invalid clicks*).

The amended complaint nevertheless claims that Facebook should not have charged plaintiff for engagements from accounts that plaintiff suspects are fake based on *plaintiff's* own "red flag" review. *See id.*, ¶¶ 17, 52, 56, 59, 62, 65, 68-72. However, plaintiff does not allege that it ever shared the results of its "red flag" review with Facebook, let alone that plaintiff did so before being charged for activity associated with these accounts. Plaintiff does not allege any other basis from which to discern that Facebook knew these accounts were fake before charging plaintiff. *Cf. id.*, ¶¶ 57, 60, 63, 66 (simply claiming that Facebook "wrongly charged" plaintiff and did not issue any refunds for engagements from accounts that plaintiff believes to be "fake"). And, as explained, plaintiff also does not allege that it ever requested refunds for specific charges, let alone within the window of time set by the Community Payments Terms' "duty to notify" provision. *See supra*, Parts II(B), IV(A). Accordingly, there is no plausible allegation that Facebook determined these accounts were fake and then proceeded to charge plaintiff anyway, as would be needed to establish that the statement at issue is anything other than true as written. *Cf. Freeman*, 68 F.3d at 289 (concluding that plaintiff failed to allege consumer deception

based on sweepstakes promotions when "[t]he promotions expressly and repeatedly state the conditions which must be met in order to win").[8]

This omission is especially egregious in light of plaintiff's admission that Facebook did *not* issue charges or deny refunds in cases "where the fake accounts were specifically identified by the advertiser." Dkt. 71, ¶ 67. In other words, plaintiff alleges that Facebook had a practice of not charging for activity from accounts brought to Facebook's attention and determined to be fake, which is consistent with the statements plaintiff now claims are misrepresentations. No reasonable consumer would be misled by statements that, per plaintiff's own allegations, accurately reflect Facebook's practices. *See Hadley*, 243 F. Supp. 3d at 1092 (plaintiff failed to state fraud-based UCL claim where statement was "factually accurate" and plaintiff "[did] not contest that it [was] factually true" on its face); *see also Tae Hee Lee*, 992 F. Supp. 2d at 976 ("Plaintiff cannot state a UCL claim based on fraud because Plaintiffs have failed to identify any untruthful statement made by [defendant]").[9]

### c)   Plaintiff was not promised a perfect system.

The most generous reading of plaintiff's allegations is that plaintiff faults Facebook for not ensuring perfect authenticity on its platforms, but that theory fails both as a matter of common sense and as a matter of law. *See supra*, Part II(B). Plaintiff does not identify a single representation in which it

---

[8]   Plaintiff does claim that eight specific accounts identified through its "red flag" review "were also subsequently removed by Facebook likely for violating of its 'inauthenticity policy,'" but offers no factual basis for this assertion. *See* Dkt. 71, ¶ 68. Plaintiff also does not say when these accounts were removed and if it was before plaintiff was charged, how plaintiff knows Facebook removed them (as opposed to, *e.g.*, deletion by the account holders), or that plaintiff ever filed a complaint about these accounts or asked Facebook for a refund for engagements from them, let alone within the thirty-day period specified by the Community Payments Terms.

[9]   Notably, plaintiff's original complaint described how plaintiff directly contacted Facebook—just once—on June 29, 2018, stating, "I am concerned with the likelihood of fake account activity within my Facebook ad account. Recently Facebook deleted millions of accounts self described as fake. I believe fake Facebook accounts have contributed to clicks, likes, shares etc. on ads I've placed, thus resulting in a billable activity to my account. Please accept this request for a 100% review of all billing associated with this account. Please advise your findings of any fake account activity taking place within my ad account." Dkt. 2, ¶¶ 71-72. Plaintiff never specified what it meant by a "100% review" that was not already covered in Facebook's default authentication efforts, and never flagged any specific accounts or charges that it wanted Facebook to review or that it suspected to be fake (despite repeated requests from Facebook to do so). Plaintiff removed any mention of this communication from the amended complaint.

1  was promised a perfect system that catches all fake account activities on Facebook's platform. That

2  alone forecloses this theory. *See, e.g.*, *In re Facebook PPC Advert. Litig.*, 2010 WL 5174021, at *9

3  (N.D. Cal. Dec. 15, 2010) (Fogel, J.) (in light of recognition "that no existing filtering system is capable

4  of detecting all fraudulent clicks . . . a reasonable member of the public could not view Facebook's

5  representation as a guarantee that its filtering system always will be effective").

6       Moreover, such a theory contradicts the Self-Serve Ad Terms to which plaintiff admittedly

7  agreed. Those terms make clear that Facebook employs mechanisms "that *attempt* to detect and filter

8  certain click activity" but that Facebook is "not responsible for click fraud, technological issues, or other

9  potentially invalid click activity that may affect the cost of running ads." Simonsen Decl., Ex. 1 § 9

10 (emphasis added). The Self-Serve Ad Terms also expressly state that Facebook "use[s] best efforts to

11 deliver the ads to the audience you specify or to achieve the outcome you select" but that it "cannot

12 guarantee in every instance that your ad will reach its intended target." *Id*. § 1. Finally, the contract

13 warns that Facebook "do[es] not guarantee the reach or performance that your ads will receive, such as

14 the number of people who will see your ads or the number of clicks your ads will get." *Id*. § 8. In light

15 of this clear contractual language, a reasonable member of the public could not view any of the alleged

16 statements as a guarantee that Facebook's system would be effective against all fake account activities.

17      To the extent plaintiff contends that Facebook nevertheless should have refunded charges from

18 years ago based on plaintiff's manual review of some self-selected accounts, that argument, too, is

19 foreclosed by plaintiff's contract with Facebook. Plaintiff identifies no promise to refund disputed

20 charges that plaintiff only now has brought to Facebook's attention. To the contrary, the contract

21 specifies that payment disputes must be brought to Facebook's attention within thirty days of the charge

22 at issue or else they are waived. *Id.*, Ex. 2 § 4.3. Without timely notification of suspected problematic

23 transactions, Facebook cannot take action to prevent further financial loss. *Id*. Plaintiff cannot now

24 circumvent this contractual requirement by raising disputes about transactions that occurred years ago.

25                    **d)    Any fraudulent-omission theory of UCL liability fails.**

26      A conclusory sentence in plaintiff's amended complaint states, "Facebook's misrepresentations

27 that it would deliver ads to genuine followers, *and omission to disclose* that it was charging advertisers

28 for engagements with fake accounts to maximize its own ad revenue, was likely to deceive advertisers

such as Plaintiff and the members of the Class." Dkt. 71, ¶ 91 (emphasis added). To the extent plaintiff intends to plead a fraudulent-omission theory under the UCL via this passing reference to a supposed "omission to disclose," such a theory fails because the amended complaint does not even attempt to allege facts showing any duty to disclose. *See Hodsdon v. Mars, Inc.*, 891 F.3d 857, 865 (9th Cir. 2018) (without an "affirmative duty to disclose," a "failure to disclose" does not support a claim under the UCL's "fraudulent" prong). A UCL omission claim requires plaintiff to allege, among other things, that the omission "relate[d] to the central functionality of the product" at issue. *Id.* at 863. Not only does the amended complaint allege nothing of the sort, it recognizes and does not dispute that fake accounts generally comprise a small fraction of Facebook's active user base. Moreover, the specific charges plaintiff complains of in this lawsuit similarly constitute a tiny fraction of the advertising campaigns plaintiff placed over the four-and-a-half-year time period at issue. *See infra*, Part IV(D)(2). If anything, these allegations, especially when read in combination with the clear disclaimers in the Self-Serve Ad Terms, contradict the notion that any alleged "omission to disclose" by Facebook related to the "central functionality" of its self-serve advertising products.

Even if plaintiff had attempted to plead a duty to disclose (which it did not), plaintiff alleges no facts plausibly suggesting that Facebook "charg[ed] advertisers for engagements with fake accounts to maximize its own ad revenue." *See* Dkt. 71, ¶ 91. On the contrary, the amended complaint indicates that Facebook invests substantial effort detecting and removing fake accounts; that Facebook has an internal tool for users to report specific instances of fake account activity (that plaintiff does not claim to have used); that Facebook has a written contract with advertisers requiring them to dispute charges within thirty days (that plaintiff did not comply with); and that, when advertisers do identify specific engagements that Facebook determines came from fake accounts (which plaintiff never did), Facebook does *not* charge them for such engagements. *See supra*, Parts II(A)-(C). These allegations foreclose any fraud theory, whether framed as affirmative misrepresentation or omission.

### 2.    Plaintiff Does Not Allege Unlawful Conduct.

The UCL's "unlawful" prong "borrows" violations of other laws and makes them independently actionable. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Here, plaintiff purports to borrow the FAL as a predicate violation for its UCL claim. Dkt. 71, ¶ 102.

However, like the UCL, the FAL requires plausible allegations of reasonable consumer deception, so plaintiff's claim under the UCL's "unlawful" prong fails for the same reasons discussed in the previous section. *See, e.g.*, *Becerra*, 945 F.3d at 1228 (UCL and FAL are both "governed by the 'reasonable consumer' test"). Because plaintiff alleges no factual basis, aside from its defective UCL allegations, to support an inference that Facebook violated the FAL, plaintiff's claim under the "unlawful" prong of the UCL should be dismissed. *See Kent v. Hewlett-Packard Co.*, 2010 WL 2681767, at *10, *12 (N.D. Cal. July 6, 2010) (Fogel, J.) (refusing to accept plaintiff's "conclusory allegation that [defendant] has violated the California False Advertising Law" in dismissing claim under UCL's "unlawful" prong).

        **3.**       **Plaintiff's Claim Fails Under the "Unfair" Prong for Independent Reasons.**

Although the "unfair" prong of the UCL can encompass certain practices even if they are not specifically proscribed by some other law, it is not unlimited. To wit, "[c]ourts may not simply impose their own notions of the day as to what is fair or unfair." *Cel-Tech*, 20 Cal. 4th at 180, 182; *see also id.* at 184-85 (rejecting interpretations of UCL that are "too amorphous," "apply purely subjective notions of fairness," and "provide too little guidance to courts and businesses"). In particular, the UCL's "unfair" prong "does not give the courts a general license to review the fairness of contracts." *Samura v. Kaiser Found. Health Plan, Inc.*, 17 Cal. App. 4th 1284, 1299 n.6 (1993). Claims under this prong are subject to dismissal when the plaintiff fails to explain how the defendant's conduct "was deceptive or misleading" in light of the defendant's "contractual rights" to engage in that conduct. *Miron v. Herbalife Int'l, Inc.*, 11 F. App'x 927, 930-31 (9th Cir. 2001) (affirming dismissal of UCL claim).

Following *Cel-Tech*, California courts have split on the appropriate standard for non-competitor claims under the "unfair" prong. *Compare, e.g.*, *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718-19 (2001) (balancing test), *with Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002) (tethering test). Although the amended complaint leaves ambiguous which standard plaintiff seeks to invoke, *see* Dkt. 71, ¶¶ 96-101, plaintiff's claim under the "unfair" prong fails under both the tethering test and the balancing test.

*First*, the tethering test should apply here and requires that any finding of unfairness under the UCL "be tethered to some legislatively declared policy." *See Cel-Tech*, 20 Cal. 4th at 186. Otherwise, as this Court has explained, "the courts will roam across the landscape of consumer transactions picking

and choosing which they like and which they dislike." *Morris v. BMW of N. Am., LLC*, 2007 WL 3342612, at *8 (N.D. Cal. Nov. 7, 2007) (Alsup, J.).

Plaintiff's sole attempt to satisfy the tethering test is a conclusory assertion that "Facebook's deceptive and misleading conduct, as alleged . . . violates established public policy against deceptive conduct by businesses." Dkt. 71, ¶ 96. But this boilerplate invocation does not suffice. "[W]here a claim of an unfair act or practice is predicated on public policy," *Cel-Tech* requires "that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." *Gregory*, 104 Cal. App. 4th at 854; *see also, e.g.*, *San Miguel v. HP Inc.*, 317 F. Supp. 3d 1075, 1092 (N.D. Cal. 2018) (Davila, J.) (general allegations that "unfair methods of competition and unfair acts and practices are contrary to California law and policy," which did not identify a "constitutional, regulatory or statutory provision to which the allegations are tethered," were "too vague" to satisfy the tethering test; collecting similar decisions). Plaintiff has identified no such provision here. Even if it did, the amended complaint still would fail to state a claim under the "unfair" prong of the UCL because, as explained, plaintiff fails to plausibly allege any "deceptive conduct" by Facebook in the first instance.

*Second*, even if the balancing test applied here (which it should not), it also would compel rejection of plaintiff's claim. That test examines the impact of a business practice on affected consumers "balanced against the reasons, justifications and motives of the alleged wrongdoer," and requires courts to "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Smith*, 93 Cal. App. 4th at 718. Because plaintiff does not plausibly allege that it suffered harm as a result of any wrongdoing by Facebook, especially in light of the Self-Serve Ad Terms' express disclaimers, plaintiff's UCL claim would fare no better under the balancing test. *See, e.g.*, *Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1045-46 (C.D. Cal. 2008), *aff'd sub nom.*, 349 F. App'x 174 (9th Cir. 2009) (Snyder, J.) (holding that plaintiffs failed to allege "a *prima facie* case of harm" where "[p]laintiffs entered into written contracts with defendants[, and d]efendants complied with the express terms of the contracts, and charged plaintiffs in accordance with their terms"); *see also In re Facebook PPC Advert. Litig.*, 2010 WL 3341062, at *11 n.5 (N.D. Cal. Aug. 25, 2010) (Fogel, J.) ("Plaintiffs do not allege sufficiently that they could not have avoided the claimed injury

related to charges for 'click fraud,' as the disclaimers in the agreement state unambiguously that Defendant cannot be liable for 'click fraud.'").

### D.    Plaintiff Lacks Statutory Standing To Bring a UCL Claim.

UCL standing in a private action extends only to "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Thus, to establish statutory standing, a plaintiff must "(1) establish . . . *economic injury*, and (2) show that the economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322 (2011). A plaintiff alleging misrepresentations must plead "actual reliance on the allegedly deceptive or misleading statements" to have standing under the UCL. *Id.* at 326-27 & n.9 (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009)). Plaintiff fails to plead either actual reliance or economic injury.

#### 1.    Plaintiff Does Not Adequately Allege Actual Reliance.

Plaintiff claims that "[f]rom on or about December 1, 2013, through May 1, 2018, [p]laintiff read and reviewed various representations by Facebook about advertising on Facebook, including the representations identified in paragraphs 41 through 47 above." Dkt. 71, ¶ 48. Nowhere, however, does plaintiff allege *facts* suggesting that it actually *relied* on any one of these particular representations. In fact, plaintiff does not even specify *when* it saw any one of these representations in relation to its decision to place advertising campaigns. "The timing of the statements is critical, as [plaintiff] cannot establish reliance on these statements if the statements did not exist at the time of the contracting." *In re Facebook PPC Advert. Litig.*, 2010 WL 3341062, at *10.

Plaintiff does allege generally that, "[i]n deciding to start and continue advertising on Facebook," it "saw and reasonably relied upon representations by Facebook that it would display [p]laintiff's ads to real Facebook users." Dkt. 71, ¶ 92. Leaving aside that Facebook *did* display plaintiff's ads to many real Facebook users (and plaintiff does not dispute as much), these conclusory assertions cannot support a plausible claim absent any *facts* suggesting that plaintiff actually saw and relied on any particular statement *before* placing an ad. *See also In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 970 (S.D. Cal. 2012) (Battaglia, J.) (plaintiffs who made their purchases

1    prior to defendant's representations lacked UCL standing); *Resnick v. Hyundai Motor Am., Inc.*, 2017

2    WL 1531192, at *20 (C.D. Cal. Apr. 13, 2017) (O'Connell, J.) (same).

3          Plaintiff's failure to allege when it saw or relied on any given statement is particularly

4    concerning given that this information falls exclusively within plaintiff's control. It initiated this suit

5    nearly two years ago and has had more than sufficient time between then and now to determine whether

6    and when it saw and relied on particular statements. If plaintiff cannot do so now, it is exceedingly

7    unlikely that it will be able to do so in the future, as discovery from Facebook will not give plaintiff

8    insight into its own reliance. Plaintiff's claim therefore should be dismissed, and with prejudice. *See*

9    *Kelsey K. v. NFL Enters. LLC*, 2017 WL 3115169, at *5 (N.D. Cal. July 21, 2017), *aff'd*, 757 F. App'x

10   524 (9th Cir. 2018) (Alsup, J.) (dismissing claim with prejudice when "the allegation is conspicuously

11   and suspiciously silent on key facts," including "information exclusively within plaintiff's own control,"

12   because "[t]here is no reason to leave such details to insinuation").

13         **2.**     **Plaintiff Does Not Adequately Allege Resulting Economic Injury.**

14         While Facebook allegedly represented that it "tr[ies] to identify when people are creating fake

15   accounts," Dkt. 71, ¶ 7, plaintiff does not and cannot allege that Facebook ever represented that those

16   efforts would work perfectly. In fact, by accepting the Self-Serve Ad Terms, plaintiff expressly agreed

17   that Facebook was "not responsible for click fraud, technological issues, or other potentially invalid

18   click activity that may affect the cost of running ads." Simonsen Decl., Ex. 1 § 9; *see also id.* §§ 1, 8

19   (providing additional disclaimers that results are not guaranteed); *In re Facebook PPC Advertising*

20   *Litig.*, 2010 WL 3341062, at *11 n.5 ("Plaintiffs do not allege sufficiently that they could not have

21   avoided the claimed injury related to charges for 'click fraud,' as the disclaimers in the agreement state

22   unambiguously that Defendant cannot be liable for 'click fraud.'").

23         Plaintiff now alleges that a handful of charges it incurred were attributable to accounts that it

24   suspects of being fake. Dkt. 71, ¶¶ 54-68. But plaintiff does not dispute that these supposedly fake

25   accounts constituted only a fraction of the seventy self-selected accounts it zeroed in on for manual

26   review—nevermind the entire population of activity across its 55 advertising campaigns over four-and-

27   a-half years. *See id.*, ¶ 52. In other words, plaintiff got exactly what it bargained for—the ability to

28   attract advertising engagement with the fully disclosed risk that the performance and reach of the ads

were not guaranteed and that some of that engagement may arise from fraudulent or invalid accounts. At most for plaintiff, the amended complaint suggests plaintiff is dissatisfied with the terms it agreed to, but that does not rise to an economic injury resulting from wrongdoing by Facebook. *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009) (finding no UCL injury where "[t]he plaintiffs' alleged injury in fact is premised on the loss of a . . . benefit that was not part of the bargain to begin with"); *Singh v. Google, LLC*, 2018 WL 984854, at *4 (N.D. Cal. Feb. 20, 2018) (Freeman, J.) (dismissing UCL claim for lack of statutory standing because even if Google represented that its filters catch the "vast majority of invalid clicks," "if an advertiser paid for fraudulent clicks at a rate below 10% or even 5% of their overall clicks, there would be no injury"); *see also Samura*, 17 Cal. App. 4th at 1299 n.6 (UCL's "unfair" prong "does not give the courts a general license to review the fairness of contracts").

### E.   Leave To Amend Should Be Denied.

Plaintiff has had ample time and opportunity to piece together a viable claim. It filed the instant action, as well as a similar lawsuit against Twitter, nearly two years ago in state court. *See* Dkt. 1; *dotStrategy, Co. v. Twitter Inc.*, Case No. 3:19-cv-06176-CRB, Dkt. 1. Yet its amended pleading fails to identify critical details about the allegedly fraudulent conduct that are within plaintiff's sole control, including when and where plaintiff saw the alleged misrepresentations and why and how plaintiff claims to have been misled. *See supra*, Parts IV(B)-(C).

Moreover, plaintiff's latest pleading attempt reflects efforts to remove allegations from the original complaint that are fatal to plaintiff's claim. *See supra*, Part II(B). These evasive tactics and lack of ability to plead critical details within plaintiff's control despite the length of time that has elapsed show that plaintiff has no viable claim and likely will not be able to plead additional facts, consistent with prior pleadings and plaintiff's Rule 11 obligations, that would salvage this case.

Thus, further leave to amend would be futile, and the amended complaint should be dismissed with prejudice. *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) ("[A] district court need not grant leave to amend where the amendment . . . is futile."); *Kelsey K.*, 2017 WL 3115169, at *5 (denying leave to amend in part because plaintiff's pleading "artfully stop[ped] short of actually stating" key allegations, was "conspicuously and suspiciously silent on key facts," and

1   contained omissions where "the answer would be information exclusively within plaintiff's own

2   control," so "[t]here [was] no reason to leave such details to insinuation").

3   **V.     CONCLUSION**

4          For the foregoing reasons, Facebook respectfully requests that the Court dismiss plaintiff's claim

5   with prejudice.

6

7   DATED: May 21, 2020                     Respectfully submitted,

8
                                            By:    */s/ Ashley Simonsen*
9                                                  Ashley Simonsen

10                                          ASHLEY M. SIMONSEN (Bar No. 275203)
                                            COVINGTON & BURLING LLP
11                                          1999 Avenue of the Stars
                                            Los Angeles, CA 90067-4643
12                                          Telephone: +1 (424) 332-4782
                                            Facsimile: +1 (424) 332-4749
13                                          Email: asimonsen@cov.com

14
                                            SIMON J. FRANKEL (Bar No. 171552)
15                                          COVINGTON & BURLING LLP
                                            Salesforce Tower
16                                          415 Mission Street, Suite 5400
                                            San Francisco, CA 94105-2533
17                                          Telephone: + 1 (415) 591-6000
                                            Facsimile: + 1 (415) 591-6091
18                                          Email: sfrankel@cov.com

19
                                            KATHRYN E. CAHOY (Bar No. 298777)
20                                          COVINGTON & BURLING LLP
                                            3000 El Camino Real
21                                          5 Palo Alto Square, 10th Floor
                                            Palo Alto, CA 94306-2112
22                                          Telephone: + 1 (650) 632-4700
                                            Facsimile: + 1 (650) 632-4800
23                                          Email: kcahoy@cov.com

24

25                                          *Attorneys for Defendant Facebook, Inc.*

26

27

28