UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOTSTRATEGY CO., Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>FACEBOOK INC.,<br><br>          Defendant. | No. C 20-00170 WHA<br><br>**ORDER GRANTING MOTION TO DISMISS** |

## INTRODUCTION

This putative class action alleges that defendant's representations regarding advertising on its social media platform were deceptive and fraudulent in violation of California's Unfair Competition Law because, contrary to defendant's representations that advertisers would not be charged for invalid clicks to their ads, defendant nevertheless charged plaintiff for such clicks. Defendant moves to dismiss the complaint. To the extent stated herein, defendant's motion is **GRANTED**.

## STATEMENT

In plaintiff dotStrategy, Co.'s own words (Dkt. No. 71 at ¶ 2):

> [t]his case concerns the large number of fake accounts on the Platform in violation of Facebook's "authenticity policy" and Terms of Service, and the significant amount of advertising revenue that these fake accounts generate for Facebook. Advertisers are charged for actions generated through fake Facebook accounts, and when these accounts are determined by Facebook to be fake, the advertising revenue generated by these

> accounts is not refunded to advertisers such as plaintiff. This is
> contrary to Facebook's representations that advertisers will not be
> charged for "[c]licks generated through prohibited means, such as
> fake accounts," and significant monetary injury has, as a result,
> been incurred by Plaintiff and the members of the Class.

In brief, between 2013 and 2018, defendant Facebook Inc.'s website made numerous statements about advertising on Facebook, which plaintiff alleges were either false or misleading. The main statement that plaintiff complains of, however, concerns Facebook's alleged statement to advertisers that they would "not be charged for clicks that are determined to be invalid" (*id*. at ¶¶ 9 at n.8, 40, 41, 41(e), 45(a),47(a)). Crucially, the complaint fails to allege that plaintiff relied on this alleged misrepresentation, which is the crux of plaintiff's entire case, as presented during oral argument. This shortfall in pleading is fatal. Now here are the details.

The following allegations are taken from the operative complaint (Dkt. No. 71). Defendant Facebook Inc. is the world's largest social media company. Facebook's online platform allows its nearly 2.45 billion users to connect, share photos, videos, and other content with friends and family. Facebook makes money by selling advertising. In exchange for placing ads on Facebook's platform, advertisers pay for the number of clicks or the number of impressions their ads receive from Facebook users (*id*. at ¶¶ 1, 3–4, 8–9).

Facebook's website made the following and/or similar representations about advertising on Facebook. In 2013, Facebook represented that placing ads on its website would help advertisers "reach the right people" (*id*. at ¶ 42(b)). In 2014, it represented that "[o]n Facebook, you'll only pay to reach the right people who'll love your business (*id*. at ¶ 43(a)). In 2015, Facebook stated its "[a]ds are optimized to help you get more people to visit your website or increase conversions" (*id*. at ¶ 44(e)). Similar representations appeared through 2018 to the present (*see id*. at ¶¶ 45–47).

Importantly, on its business help center page, Facebook represented to advertisers that they "will not be charged for clicks that are determined to be invalid" (*id*. at ¶¶ 9 at n.8, 40, 41, 41(e), 45(a),47(a)). "Invalid" clicks are "clicks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook

2

terms" (*id*. at ¶ 41(a)). Facebook, in turn, defined fake/false accounts as, among other things, "violating accounts, which represent user profiles that [Facebook] believe[s] are intended to be used for purposes that violate [Facebook's] terms of service, such as bots or spam" (*id*. at ¶ 50) (emphasis omitted).

Plaintiff is an Arkansas marketing company operated by its sole managing member Bill Doshier (*id*. at ¶ 22). From 2013 through 2018, plaintiff placed a total of 55 ad campaigns on Facebook for which it paid approximately eight thousand, based on the number of clicks its ads generated from Facebook users (*id*. at ¶ 49). During that period, plaintiff "read and reviewed various representations by Facebook about advertising on Facebook, including the representations [quoted above and quoted in the complaint]" (*id*. at ¶ 48). Moreover, in "deciding to start and continue advertising on Facebook, [p]laintiff saw and reasonably relied upon representations by Facebook that it would display [its] ads to real Facebook users" (*id*. at ¶ 92).

In 2018, plaintiff conducted a random survey, examining some of the Facebook accounts that had clicked its ads from 2013 to 2018, for which Facebook had charged it. Plaintiff looked for certain "red flags," which it alleges are indicative of inauthentic accounts, such as a user's profile picture, the veracity of a user's stated personal information, and whether or not a user has Facebook friends in his or her purported locality (*id*. at ¶ 52, 54–72). Based on the results of said survey, plaintiff alleges that between 2013 and 2018, Facebook charged it for clicks that were made by thirteen different fake accounts.

These thirteen fake accounts violated Facebook's terms of service and authenticity policy "because they failed to provide the person's real identity and fail[ed] to provide accurate information" (*id*. at ¶ 53). Plaintiff alleges that Facebook has since deleted eight of these thirteen accounts from its platform "likely for violations of its 'authenticity policy'" though the remaining five purportedly fake accounts still exist on Facebook's platform (*id*. at ¶ 68). Nevertheless, Facebook has not refunded plaintiff the money for any of the clicks made by any of these thirteen fake accounts. Indeed, plaintiff alleges that once Facebook has determined an

account to be fake, it does then retroactively refund advertisers the money they may have paid for clicks made by those fake accounts (*id*. at ¶¶ 2, 16–17, 22, 57, 60, 63, 66–67).

Plaintiff also makes allegations that suggest fake accounts plague Facebook's platform. For instance, plaintiff points to a *Washington Post* article that states Facebook removed three billion fake user accounts in a six-month period alone, which Facebook said were "caught while creating spam profiles" and "were never considered active" (*id*. at ¶ 77). Though Facebook has protocols in place to preemptively detect fake accounts before they become part of its monthly active user pool, by Facebook's own admission, fake users comprise five percent of this pool (*id*. at ¶¶ 14–15).

This putative class action alleges that Facebook violated the "unlawful," "unfair," and "fraudulent" prongs of California's Unfair Competition Law — California Business and Professions Code Sections 17200, *et seq*. (*id*. at ¶¶ 91–104).

Facebook moves to the dismiss plaintiff's complaint for (1) failure to comply with the duty-to-notify provision in Facebook's community payment terms; (2) failure to meet the heightened pleading standard of Rule 9(b); (3) failure to plead statutory standing; and (4) failure to plead a plausible claim under any prong of Section 17200. *First*, this order finds that Facebook's duty-to-notify provision does not bar plaintiff's claims. Next, the order holds that plaintiff has failed to plead facts demonstrating that it has statutory standing to sue under Section 17200. Because reliance is dispositive here, this order forgoes discussion of Facebook's other arguments.

1. **FACEBOOK'S REQUEST FOR CONSIDERATION OF DOCUMENTS.**

Along with its motion to dismiss, Facebook requests consideration of various of its webpages: two versions of its community payment terms and the current version of its self-serve ad terms — a written contract that plaintiff had to agree to in order to place ads on Facebook (Decl. Simonsen, Exhs. 1–3). Plaintiff offers no opposition.

Facebook argues that consideration of all three documents is proper based to the incorporation-by-reference doctrine, as the amended complaint is replete with citations and quotations to Facebook's terms of service, which incorporated the self-serve ad terms that, in

4

turn, incorporated the community payment terms. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (in considering a motion to dismiss, a court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached" to the plaintiff's pleading).

Moreover, Facebook argues that consideration of Facebook's self-serve ad terms is proper for the additional reason that plaintiff's original complaint (*see* Dkt. No. 2 at ¶ 31) admitted that plaintiff remained bound to the agreement notwithstanding the fact that its amended complaint omits explicit mention to it (Dkt. No. 72 at 5 n.4) (citing *Royal Primo Corp. v. Whitewater W. Indus., Ltd.*, 2016 WL 1718196, at *3 (N.D. Cal. Apr. 29, 2016) (Magistrate Judge Joseph Spero) ("The principle that a court may look to prior pleadings in determining the plausibility of an amended complaint is well established.")).

Because plaintiff does not oppose Facebook's request for consideration of these documents, nor mounts any specific challenge to the authenticity of these documents, this order considers Facebook's self-service ad terms and its community payment terms in ruling on its motion to dismiss (*See* Decl. Simonsen, Exhs. 1–3).

## ANALYSIS

1. **WHETHER PLAINTIFF WAIVED ITS CLAIMS BY FAILING TO COMPLY WITH THE TERMS OF THE CONTRACT.**

As a threshold matter, Facebook argues that plaintiff waived its claims by failing to allege that it complied with the "duty to notify" provision contained in Facebook's community payment terms. That provision provided (Simonsen Decl. ¶ 5, Exh. 2) (emphasis added):

> If you believe that an unauthorized or otherwise problematic transaction has taken place under your account, you agree to notify us immediately, so that we may take action to prevent financial loss. Unless you submit the claim to us *within 30 days* after the charge, you will have *waived*, to the fullest extent permitted by law, all claims against us arising out of or otherwise related to the transaction.

The complaint does not allege (and plaintiff does not argue) that plaintiff notified Facebook of the thirteen complained of charges within thirty days. Plaintiff also does not assert that it was not bound to the terms of the agreement. Facebook thus argues that plaintiff's

amended complaint should be dismissed with prejudice because its Section 17200 claim "arises out of or otherwise relate[s] to" the thirteen alleged invalid transactions (Dkt. No. 72 at 9). Plaintiff disagrees and argues that Facebook's contractual statute of limitations is unenforceable as "facially unreasonable" because "[i]t would effectively bar any claim against Facebook even *before* the loss or damage in question can be ascertained, as identification of fake accounts require investigation and analysis;" because the evidence required to ascertain whether or not a Facebook account is fake is "largely within Facebook's possession[;]" and because identifying fake accounts is admittedly challenging for Facebook itself, in spite of its vast resources and technology (Dkt. No. 74 at 10–11) (emphasis in original). This order agrees with plaintiff.

"Contractual limitations periods are valid and can be shorter than limitations periods prescribed by statute so long as the period for bringing claims is reasonable." *Han v. Mobile Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995); *see also Ellis v. U.S. Security Assocs.*, 224 Cal. App. 4th 1213, 1223 (2014) ("[A] contractual period of limitation is reasonable if the plaintiff has a sufficient opportunity to investigate and file an action, the time is not so short as to work a practical abrogation of the right of action, and the action is not barred before the loss or damage can be ascertained.") (internal quotations and citations omitted)).

Under the circumstances alleged here, this order finds that Facebook's waiver provision is unenforceable because thirty days was an unreasonably short period of time for plaintiff to identify, investigate, and then bring a claim — at least insofar as the claim relates to charges for fake clicks. Indeed, plaintiff would have had to perform a serious investigation of the charges made to its Facebook advertising account in order to determine whether or not the clicks made to his ads were made by fake Facebook accounts. As plaintiff alleges here, it had to analyze each Facebook user's profile to examine various factors, including the composition of each user's Facebook friends, in order to ascertain whether or not any of the accounts that clicked its ads were fake.

Facebook relies heavily on *Free Range Content, Inc. v. Google Inc.*, 2016 WL 2902332 (N.D. Cal. May 13, 2016) (Judge Beth L. Freeman) for its contention that its waiver provision

1   is reasonable and thus enforceable. There, Judge Freeman enforced a contractual statute of
2   limitations that required the plaintiffs to "dispute any payment" within thirty days of such
3   payment or waive "any claim relating to the disputed payment[.]" *Id*. at 13. Accordingly, her
4   order dismissed all payment related claims of two of the plaintiffs who had not timely
5   submitted a dispute to Google. *Id*. at 12. The order found it significant that the plaintiffs
6   needed only to "dispute" a payment, as opposed to "file a full claim." *Ibid*. Further, she held
7   that the fact that other plaintiffs in the action had alleged to have submitted their disputes
8   within the prescribed time, evinced that thirty days was reasonable. The facts of this action are
9   distinguishable.

*First*, in contrast to *Free Range Content*, the waiver provision here required plaintiff to file a full *claim* within thirty days. Thus, plaintiff did not just need to *dispute* a charge. *Cf. Feldman v. Google Inc.*, 513 F.Supp.2d 229, 243 (E.D. Pa. Mar. 29, 2007) (Judge James T. Giles) (enforcing a contractual limitations period that provided the plaintiff with sixty-days to make any charge-related "claim" because that time period provided the plaintiff, an attorney, "sufficient time to identify, investigate, and report billing errors"). *Second*, there are no other plaintiffs here who allege that they complied with the provision. Hence, unlike *Free Range*, there is no support, "by example" that the waiver provision was reasonable.

Facebook further argues that the complaint's allegation that plaintiff only needed one day to survey the seventy Facebook accounts that engaged with its ads, shows that filing a claim within thirty days would have been "possible" and, therefore, its contractual statute of limitations was reasonable (Dkt. No. 76 at 9) (citing Am. Compl. at ¶¶ 52, 68). This isn't persuasive. For one thing, it is unclear from the allegation how long plaintiff's survey took; this order thus cannot say that plaintiff only took one day to complete its investigation. Moreover, as stated above, identifying charges related to fake accounts are difficult, not "immediate and obvious." *See Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1430 (2003) ("[A] contractually shortened limitations period has never been recognized outside the context of straight forward transactions in which the triggering event for either a breach of a contract or

for the accrual of a right is immediate and obvious."). For another, plaintiff's investigation was limited to only some of the accounts (70) that had engaged its ads, not all.

Similarly, the allegation that Facebook does not refund advertisers after determining an account is fake, "except in the rare cases where the fake accounts were specifically identified by the advertiser[,]" does not speak to the reasonability of its thirty-day waiver provision. This allegation says nothing about what time frame any advertiser identified those accounts to Facebook (*id.* at ¶ 67).

The other authorities Facebook relies on are similarly inapposite (Dkt. No. 76 at 8–9) (quoting *Espresso Roma Corp. v. Bank of Am.*, 100 Cal. App. 4th 525 (2002), and *Story Rd. Flea Mkt., Inc. v. Wells Fargo Bank*, 42 Cal. App. 4th (1996)). Neither *Espresso Roma* nor *Story Road* involved a contractual statute of limitations. Rather, those decisions concerned whether or not bank customers were barred from bringing claims against the bank for unauthorized payment of checks drawn from their accounts when they failed to report them within the thirty days required by California's Uniform Commercial Code. That is not the issue here.

In short, allowing plaintiff only thirty days to thoroughly investigate every single Facebook account that clicked its ads was unreasonable — though perhaps, as Facebook contends, remotely possible. Accordingly, under the circumstances alleged here, this order finds that Facebook's waiver provision is unenforceable.

2. **WHETHER PLAINTIFF HAS PLED STATUTORY RELIANCE WITH PARTICULARITY.**

Facebook contends that plaintiff's complaint should be dismissed for failure to specifically allege facts showing plaintiff has statutory standing under Section 17200. This order agrees. On the one hand, the complaint recites 45 statements made by Facebook over the years and adequately pleads that it "read and reviewed" all of them (Dkt. No. 71 at ¶ 48). On the other hand, when it comes to the important issue of reliance, the complaint merely states that "[p]lainitff saw and reasonably relied upon representations by Facebook that it would display [its] ads to real Facebook users" (*id.* ¶ 92). Significantly, there is no allegation that

8

plaintiff reasonably relied upon any statement by Facebook that it would "not [] charge[] for clicks that are determined to be invalid" — yet that is the crux of plaintiff's case. This shortfall in pleading is fatal. Perhaps it will be easy to cure this shortfall by specifically alleging that plaintiff in fact relied on the specific statement that Facebook would not charge "for clicks that are determined to be invalid." But the complaint has not done so yet.

To establish standing under Section 17200, a plaintiff must demonstrate that he "suffered injury in fact and [] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. When a plaintiff's Section 17200 claim is based on a defendant's misrepresentation, a plaintiff must have actually relied on the misrepresentation and suffered economic injury as a result of that reliance, in order to have standing to sue under the statute. *See In re Tobacco II Cases*, 46 Cal.4th 298, 314 (2009). This showing extends not only to claims brought under the fraudulent prong of Section 17200, but also to the "unfair" and "unlawful" prongs as well, "so long as the pleadings assert a cause of action grounded in misrepresentation or deception." *In re Actimmune Mktg. Litig.*, 2010 WL 346491, at *8 (N.D. Cal. Sep. 1, 2010) (Judge Marilyn Hall Patel), *aff'd*, 464 F. App'x 651 (9th Cir. 2011); *see also Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 326 (2011) (same).

Here, the essence of plaintiff's Section 17200 claims are that Facebook's representations regarding its advertising product are grounded in fraud, as it alleges a continuous course of false, deceptive, and misleading activity (*see* Dkt. No. 71 at ¶¶ 91–104). Thus, plaintiff must plead actual reliance with sufficient particularity under Rule 9(b) in order to have statutory standing to pursue its claims under all three prongs of Section 17200.

Again, plaintiff's main theory of the case rests upon Facebook's alleged misrepresentation that it would not charge advertisers "for clicks that are determined to be invalid" (Dkt. No. 71 at ¶¶ 2, 9, 19, 40 at n.26, 41(a), 41(e), 43(a), 44(a), 45(a), 47(a)). The complaint, however, fails to allege that plaintiff actually relied on this particular representation, and if so, then when — that is, whether its reliance on said representation occurred prior to placing ads on Facebook or at some point after. Indeed, the complaint's sole allegation

9

1   concerning reliance on any of the 45 alleged misrepresentations it quotes is limited to the

2   following allegation (*id.* at ¶ 92):

3   > In deciding to *start and continue* advertising on Facebook, Plaintiff *saw and reasonably relied* upon representations by Facebook that it would display Plaintiff's ads to real Facebook users.

4

5   This general allegation fails to plead actual reliance on the representation that Facebook

6   would not charge "for clicks that are determined to be invalid" with the specificity required by

7   Rule 9(b).

8   To be sure, plaintiff does allege elsewhere in the complaint that it read all of the 45

9   Facebook representations it quotes in the complaint, including the statement concerning invalid

10  clicks; however, its unspecific and bare allegation about reliance appears to exclude the

11  statement about Facebook's *charging practice* concerning "invalid clicks" by limiting the

12  scope of its reliance allegation to "representation by Facebook that it would *display*

13  [p]laintiff's ads to real Facebook users." (emphasis added).

14  At the hearing, plaintiff argued it has sufficiently pled reliance on Facebook's statement

15  concerning invalid clicks because another judge in this district recently found plaintiff's

16  identical allegation in its sister suit against another social media company sufficient to plead

17  reliance. *See dotStrategy Co. v. Twitter Inc.*, 2020 WL 4465966 (N.D. Cal. Aug. 3, 2020)

18  (Judge Charles Breyer). That action is distinguishable, however. Importantly, the material

19  allegedly false statements there differed from the one at issue here. There, Twitter had

20  promised that plaintiff would only be charged for interactions with "people." Judge Breyer

21  thus found plaintiff's allegation that it "reasonably relied upon representations by Twitter that

22  it would display [p]laintiff's ads to real Twitter users" sufficient to plead reliance on Twitter's

23  representations about only charging for engagements with "people," as opposed to non-people

24  like bots, which are clearly not real people.

25  Here, the specific misrepresentation that plaintiff hangs its hat on concerns Facebook's

26  statement about not charging for "invalid clicks," not a statement that Facebook would only

27  charge it for interactions with "people." Thus, unlike there, the allegation that plaintiff relied

28  on representations that Facebook would "display [p]laintiff's ads to real . . . users" fails to

10

connect plaintiff's reliance allegation to Facebook's statement here at issue concerning invalid clicks.

Next, plaintiff argues that it has satisfied an exception under California law established by *In re Tobacco II cases*, which allows it to plead its claims without pleading reliance on any specific representation (Dkt. No. 74 at 22). This order finds that the complaint has not satisfied the exception.

In *Tobacco II*, the California Supreme Court held that, while a plaintiff alleging a Section 17200 claim "must plead and prove actual reliance," the plaintiff "is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where, as here, those misrepresentations and false statements were part of an extensive and long-term advertising campaign." *In re Tobacco II Cases*, 46 Cal.4th at 328.

Plaintiff's attempt to invoke *Tobacco II* fails because, as discussed above, it has not pled any form of reliance on Facebook's statement related to charges for invalid clicks. *See In re Tobacco II Cases*, 46 Cal.4th at 328 (even under the *Tobacco II* exception, a plaintiff "must plead and prove actual reliance."). This alone is dispositive.

## CONCLUSION

To the foregoing extent, Facebook's motion to dismiss is **GRANTED.**

Plaintiff is invited to move for leave to amend his complaint by **SEPTEMBER 11, 2020, AT NOON**. Plaintiff must plead his best case. Its motion should affirmatively demonstrate how the proposed amended complaint corrects the deficiencies identified in this order, as well as any other deficiencies raised in Facebook's motion but not addressed herein. The motion should be accompanied by a redlined copy of the amended complaint.

**IT IS SO ORDERED.**

Dated: August 28, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE