UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOTSTRATEGY CO., individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>FACEBOOK INC.,<br><br>    Defendant. | No. C 20-00170 WHA<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND** |

### INTRODUCTION

This putative class action alleges that defendant's representations regarding advertising on its social media platform were deceptive and fraudulent in violation of California's Unfair Competition Law. A prior order granted defendant's motion to dismiss plaintiff's first amended complaint. Plaintiff now moves for leave to file its second amended complaint. The main issue presented here is whether or not a reasonable advertiser would understand Facebook's representation that it would not charge advertisers for "clicks that are determined to be invalid" to mean that Facebook would not charge — or refund — advertisers for clicks made by fake accounts, if at all, which Facebook identifies and removes from its platform for violating its authenticity policies. This order finds, at least at this early stage, plaintiff has pled sufficient facts to support such a theory. Moreover, the proposed complaint has cured the

deficiency identified previously. Accordingly, to the extent stated herein, plaintiff's motion is **GRANTED**.

**STATEMENT**

Plaintiff dotStrategy Co., a marketing company ran by its sole-member Bill Doshier, brought this putative class action under all three prongs of California's Unfair Competition Law — California Business and Professions Code Sections 17200, *et seq.* — alleging that Facebook Inc. made false and/or misleading statements about advertising on Facebook.

This action was originally brought in Arkansas state-court before ultimately landing here. The original complaint brought there contained Arkansan state law claims only. Plaintiff amended its complaint when this action was transferred here, dropping all the state law claims, including breach of contract, adding instead claims under Section 17200 (Dkt. No. 71). Facebook then filed a motion to dismiss, arguing that dismissal was warranted on several grounds.

In a previous order, we first determined that the waiver provision in the parties' judicially noticed contract (*i.e.*, Facebook's self-serve ad terms) was unenforceable because thirty days was too short a time to bring a claim. Moving on to the merits, that order granted Facebook's motion to dismiss on the ground that the complaint had not sufficiently alleged reliance on the specific Facebook representation that was the crux of plaintiff's claims: that advertisers would "not be charged for clicks that are determined to be invalid" (Dkt. No. 89). Finding that plaintiff had not adequately pled reliance, that order did not reach the other grounds raised by Facebook, but instructed plaintiff to consider them if it sought leave to amend. Plaintiff then filed its current motion for leave to file its second amended complaint (Dkt. No. 95).

Now, on to the facts alleged in the proposed complaint. Plaintiff began advertising on Facebook in 2013 through 2018. Facebook charges advertisers based on the number of clicks and/or impressions made to their ads. Facebook offers targeted advertising and allows advertisers to customize their ad campaigns to achieve their specific needs. So, for instance, Facebook's ad service allows advertisers to choose what kind of demographic they want their ads displayed to (*e.g.*, age and location).

A previous order took judicial notice of Facebook's self-serve ad terms, which all advertisers are required to agree to before being able to place ads on Facebook. In the original complaint filed in Arkansas state-court, plaintiff alleged to having read this agreement (Dkt. No. 1). As relevant here, that agreement provided (*See* Decl. Simonsen, Exh. 1 at 1–2):

> When serving your ad, we use best efforts to deliver the ads to the audience you specify or to achieve the outcome you select, though we cannot guarantee in every instance that your ad will reach its intended target or achieve the outcome you select[.]
>
> We do not guarantee the reach or performance that your ads will receive, such as the number of people who will see your ads or the number of clicks your ads will get.
>
> \* \* \*
>
> We cannot control how clicks are generated on your ads. We have systems that attempt to detect and filter certain click activity, but we are not responsible for click fraud, technological issues, or other potentially invalid click activity that may affect the cost of running ads.

On the other hand, from 2013 through the present, the proposed complaint alleges that Facebook's Business Help Center page represented that advertisers would "not be charged for clicks that are determined to be invalid." More specifically, Facebook stated that (Prop. Compl. ¶ 9 n.8):

> If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid.

Facebook defines "invalid clicks" as "[c]licks from people that do not indicate a genuine interest in the ad or show signs of ad testing. This includes repetitive or accidental clicks or visits from the Facebook corporate network" and "[c]licks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook's Terms" (*ibid*.). Indeed, Facebook's terms of service and authenticity policy requires users to use their "real identities." Fake accounts thus violate Facebook's policies.

Furthermore, the proposed complaint also quotes a myriad of other Facebook statements that is alleges are also false and misleading. Listing several here is illustrative of the whole (*id*. at ¶¶ 42–58):

3

- "Connect with people. Ads help you reach the right people."

- "On Facebook, you'll only pay to reach the right people who'll love your business."

- "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with."

- "Facebook can help you reach all the people who matter most to your business."

- "Facebook ads are optimized to help you get more people to visit your website or increase conversion."

- "Your business is for your customers. Built relationships with them, reach new people and drive sales using Facebook."

- "Drive people to your website with one click from the most engaging place on Facebook."

- "Find new customers. Boost sales. Facebook can help you meet your business goals."

- "Meet the people who will love your business."

The proposed complaint alleges that Bill Doshier, plaintiff's managing member, read and reviewed all of the statements quoted in the proposed complaint prior to deciding to start advertising on Facebook in 2013, as well as prior to placing ads every year thereafter through 2018 (*id*. at ¶¶ 44, 47, 50, 53, 56, 59). Facebook's representations are false and misleading, the proposed complaint alleges, because (*id*. at ¶ 45) (emphasis added):

> Facebook not only charged Plaintiff and class members to reach new people, connect with people, drive people to its website, and find new customers; Facebook also charged for *invalid clicks*, which includes "[c]licks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook Terms." **When Facebook determined those *clicks* were generated through prohibited means**, it failed to provide a refund to Plaintiff and class members. Additionally, Plaintiff reasonably believed that because Facebook requires "everyone to provide their real names" it would not be charged for advertising that interacted with fake accounts.

Over and above alleging that Facebook charged plaintiff for *clicks* that Facebook determined to be invalid, the proposed complaint also alleges that Facebook does not

retroactively refund advertisers for clicks that may have been generated by *accounts* that Facebook later determines to be fake and removes from its platform. Specifically, the proposed complaint alleges that (*id*. at ¶ 17) (emphasis added):

> if Facebook charges and is paid by a user for an impression that is delivered to, or an action that is generated through, **an *account* Facebook determines to be fake**, it does not refund the money paid by the user for their campaign. Indeed, when accounts are removed from the Platform for failing to follow Facebook's authenticity policy, they **are not audited** to refund advertisers who were charged for clicks that were either generated by or through these accounts while these accounts were violating Facebook Terms. The absence of any such audit constitutes **willful blindness** and cannot shield Facebook from civil liability. Facebook cannot claim that because it failed to make an effort to determine if accounts removed from the Platform for violating Facebook's Terms regarding Facebook's authenticity policy interacted with advertising, it therefore escapes liability; Facebook never determined any clicks from such accounts to be invalid.

In 2018, plaintiff conducted a random survey that examined seventy of the Facebook accounts that had clicked its ads from 2013 to 2018, and for which Facebook had charged it for. Plaintiff looked for certain "red flags" which it alleges are indicative of inauthentic accounts, such as a user's profile picture, the veracity of a user's stated personal information, and whether or not a user has Facebook friends in his or her purported locality (*id*. at ¶¶ 70, 72–85). Based on the results of said survey, plaintiff alleges that between 2013 and 2018, Facebook charged it for clicks that were made by thirteen different fake accounts. These accounts violated Facebook's terms of service and authenticity policy "because they fail[ed] to use the person's real identity and fail[ed] to provide accurate information" (*id*. at ¶ 71). Plaintiff alleges that Facebook has since deleted eight of these thirteen accounts from its platform "likely for violations of its 'authenticity policy'" — though the remaining five purportedly fake accounts still exist on Facebook's platform (*id*. at ¶ 86).

As a result of Facebook's allegedly deceptive conduct, plaintiff alleges that it "paid for ads for which it would not have agreed to pay anything at all had it known the truth about Facebook's misconduct" (*id*. at ¶ 112).

Based on these facts, plaintiff moves for leave to amend. Facebook opposes. It does not dispute that the proposed complaint now adequately pleads reliance. Rather, Facebook offers

5

two reasons for why it contends the proposed complaint remains deficient. Facebook first argues that no reasonable consumer could have been misled by its allegedly false and/or misleading statements, particularly, in light of the contractual disclaimers in the self-serve ad terms; and second that the proposed complaint has failed to allege economic injury sufficient to confer standing to sue under Section 17200 (Dkt. No. 97). This order disagrees, as now discussed.

**ANALYSIS**

Leave to amend should be freely given "when justice so requires." Rule 15(a). Though this policy favoring amendment "should be applied with extreme liberality," courts commonly consider the following factors when assessing motions for leave to amend: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended the complaint. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

Bad faith, undue delay, and prejudice are not raised by Facebook. The only issue is futility — *i.e.*, whether the proposed complaint states a claim for relief under Section 17200. Given that plaintiff's claims under all three prongs of Section 17200 "are all grounded in fraud, the [proposed complaint] must satisfy the traditional plausibility standard of Rule 8(a) and 12(b)(6), as well as the heightened pleading requirements of Rule 9(b)." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (citation omitted). In other words, plaintiff must plead enough facts — with sufficient particularity to give defendant fair notice of the specific fraudulent conduct against which it must defend — that amount to a plausible claim for relief. *See Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The overarching issue presented in this suit is whether or not Facebook's representations concerning its charging practices would have created in a reasonable advertiser the belief that once Facebook determines and removes an *account* for violating its authenticity policies (*e.g.*, a fake account), Facebook would then perform an audit to refund advertisers for any invalid clicks that that account may have made, and for which Facebook had charged advertisers for.

6

Facebook's specific arguments are merely derivatives of this larger issue and are different sides of the same coin.

This order finds that whether or not a reasonable advertiser would have been misled by Facebook's statements is a question of fact not suitable for resolution on a motion to dismiss. *See Williams v. Geber Prods. Co.*, 552 F.3d 934, 938–39 (9th Cir. 2008) ("[W]hether a business practice is deceptive will usually be a question of fact not appropriate for decision on" a motion to dismiss). At this stage, plaintiff has alleged sufficient facts plausibly supporting its theory that a reasonable advertiser could be misled by Facebook's statements, at least if these allegations are accepted as true. This order now addresses the specifics of the parties' arguments.

### 1. REASONABLE CONSUMER TEST.

Facebook offers several arguments as to why a reasonable consumer would not be misled by its statements. *See Williams*, 552 F.3d at 938 (noting that Section 17200 claims "are governed by the reasonable consumer test" (internal quotation marks omitted)). Under this standard, a plaintiff "must show that members of the public are likely to be deceived. *Ibid*. (citations and quotations omitted). Each of Facebook's arguments are addressed in turn.

#### A. FACEBOOK'S CONTRACTUAL DISCLAIMERS DO NOT PRECLUDE PLAINTIFF'S SECTION 17200 CLAIMS.

Facebook first contends that its self-serve ad terms, which plaintiff had ostensibly alleged to have read in its original complaint filed in Arkansas state-court, foreclose plaintiff's Section 17200 claims. In particular, Facebook points to language therein stating that it is "not responsible for click fraud . . . or other potentially invalid click activity that may affect the cost of running ads." Facebook argues that a reasonable advertiser cannot read both this term and the allegedly misleading statement on its Business Help Center and still believe that Facebook would refund him for invalid clicks generated by accounts Facebook later determined to be fake. In other words, Facebook asserts that the language in the contract contradicts plaintiff's interpretation of Facebook's representations, precluding plaintiff's theory of deception. Not so.

1    As a preliminary matter, Facebook's reliance on plaintiff's original complaint, at this
2    stage, is misplaced. That is because once a complaint is amended, it supersedes the former
3    complaint, rendering it of "no legal effect." *Williams v. County of Alameda*, 26 F.Supp.3d 925,
4    936 (N.D. Cal. Feb. 10, 2014) (Judge Sandra Armstrong). When plaintiff filed its first
5    amended complaint in April 2020 (Dkt. No. 71), therefore, the original complaint became
6    "non-existent." *Desai v. Deutche Bank Sec. Ltd.*, 573 F.3d 931, 936 n.5 (9th Cir. 2009). Thus,
7    "[w]hile prior pleadings may be admissible in evidence against the pleader, the Court is bound
8    to accept as true allegations in the operative pleading on a motion to dismiss, and generally
9    cannot consider evidence outside the pleadings without converting a motion to dismiss into a
10   motion for summary judgment." *Williams*, 26 F.Supp.3d at 936 (internal citations omitted).

    Moreover, stating that Facebook is not "responsible for click fraud" is ambiguous, as it
does not clearly exclaim liability for clicks here at issue. Stating that it is not "responsible" for
click fraud is not the same as saying it is not *liable* for them. A reasonable advertiser could
construe the former to mean that Facebook itself is not perpetuating any click fraud. In any
event, our court of appeals "has recognized that a UCL fraud claim can be based on misleading
representations in a solicitation even when the plaintiff later signed a contract with provisions
contradicting the earlier falsehoods." *DotStrategy Co. v. Twitter Inc.*, 2020 WL 4465966, at *5
(N.D. Cal. Aug. 3, 2020) (Judge Charles Breyer) (citing *Rubio v. Capital One Bank,* 613 F.3d
1195, 1204–06 (9th Cir. 2010)). Thus, while inserting language in a contract contradicting the
terms of a solicitation may shield Facebook from breach of contract, it does not by itself shield
Facebook from a Section 17200 claim. "The question, then, is not whether [Facebook's]
contractual terms corrected the false statements in its advertising, but whether dotStrategy's
reliance on the false advertising was reasonable even in light of the contractual disclaimers."
*Twitter*, 2020 WL 4465966, at *5 (citation omitted). "California courts . . . have recognized
that whether a business practice is deceptive will usually be a question of fact not appropriate
for decision on demurrer." *Williams*, 552 F.3d at 938. In short, even assuming plaintiff read
the disclaimers in the self-serve ad terms, it cannot be said that its reliance was unreasonable as
a matter of law. For now, taking plaintiff's allegations as true, it has alleged sufficient facts

explaining how a reasonable advertiser could, at the very least, be misled by Facebook's statements, as discussed in detail below.

### B. WHETHER PLAINTIFF HAS ALLEGED FALSITY AND/OR DECEPTION.

Facebook contends that plaintiff has failed to allege facts showing that Facebook's representations are in any way false. To start, Facebook is incorrect to the extent that it argues that only facially untrue statements can serve as the basis of a Section 17200 claim. Indeed, "[t]he California Supreme Court has recognized that [Section 17200] prohibit[s] not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams*, 552 F.3d at 938 (citations and quotations omitted).

Next, Facebook argues that not issuing a refund cannot serve as the basis for falsity because none of its alleged misrepresentations explicitly utter the word 'refund.' True, Facebook's representations do not explicitly state that a refund would be provided. But a refund is implied. As the proposed complaint alleges: a reasonable advertiser would understand "that it would not be charged — or would be offered a refund — for interactions Facebook knew involved invalid clicks such as '[c]licks generated through prohibited means, such as fake accounts, bots, scrapers, browser add-ons or other methods that don't follow Facebook Terms' " (Prop. Compl. ¶ 62). *See also Twitter*, 2020 WL 4465966, at * 3 (dismissing Twitter's identical argument regarding a comparable representation).

Moreover, Facebook tries to drive a wedge in plaintiff's theory of liability by drawing a distinction between *fake accounts* and *invalid clicks*. It argues that plaintiff has not alleged facts demonstrating that its promise to not charge advertisers "for clicks that are determined to be invalid" is anything other than true. Again, the main statement at issue is the following:

> If we detect or are alerted to suspicious or potentially invalid click activity, a manual review is performed to determine the nature of the activity. You will not be charged for clicks that are determined to be invalid.

Reading this statement narrowly, Facebook argues that it only promised not to charge for "clicks" that it determines to be invalid if and when it detects or is alerted to suspicious "click

9

activity," not that it would perform an audit every time it detects and removes a *fake account* from its platform to check for any potentially invalid click activity made by those accounts and retroactively initiate refunds to advertisers that may have paid for interactions with such fake accounts. Though this order observes and appreciates the distinction drawn by Facebook, it nevertheless finds that plaintiff has alleged plausible claims based on both theories, at least if its allegations are accepted as true.

*First*, the proposed complaint specifically alleges that Facebook charged it and other advertisers for invalid clicks, which Facebook does not initiate refunds for even after determining that they are invalid — such as clicks by fake accounts and/or bots (*see* Prop. Compl. ¶ 45). Facebook's contention that the proposed complaint has not alleged facts "suggesting that Facebook detected or was alerted to suspicious or potentially invalid click activity relating to plaintiff's ads, performed a manual review of that activity, determined the clicks to be invalid, but nevertheless charged plaintiff for them anyway" simply ignores allegations therein (Opp. 7). Thus, even under Facebook's narrow construction, plaintiff has sufficiently pled facts that, taken as true, render Facebook's statement false.

*Second*, a reasonable advertiser might also reasonably believe that once Facebook determines an *account* is fake, Facebook would be "alerted to suspicious or potentially invalid click activity" and thus would conduct a "manual review" to determine the nature of the activity — *i.e.*, whether or not Facebook charged advertisers for clicks by that fake account. How rigorous and how far reaching the manual review must be need not be decided on this motion.

Facebook's counsel's narrow construction of the statement here at issue during oral argument, ignores the principle that whether or not an advertising is false or misleading is analyzed from the perspective of a reasonable consumer, not from the perspective of an attorney splitting hairs. *See Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) ("[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer." (citation omitted)). At this stage, plaintiff has alleged ample facts that, if true, plausibly demonstrate a probability that a significant portion of

10

advertisers, "acting reasonably under the circumstances, could be misled." *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228–29 (9th Cir. 2019).

This order disagrees with Facebook's characterization that our interpretation transmutes its statement into one that subjects it to liability unless its platform is 100% secure against fake accounts. As plaintiff's counsel conceded during our hearing, plaintiff's claim is not that Facebook has a duty to rid its system of any and all fake accounts; rather, its claim is that once it does stumble upon fake accounts, Facebook then must perform an audit to refund advertisers for any invalid clicks committed by such accounts; and that not doing so runs afoul of its statements, constituting an unfair business practice.

Facebook next argues that just because an account was fake in 2018 when plaintiff performed its survey, it doesn't also follow that that account was also fake in 2017, for example, when it clicked or engaged with plaintiff's ads. This is an issue bound up in the issue of how far reaching the manual review should be. For now, it is sufficient that plaintiff alleges, in granular detail, why some of the accounts that Facebook charged it for interactions with were fake; and that Facebook has failed to refund it the amounts it paid for those interactions even after Facebook allegedly removed eight of the responsible accounts for being fake.

Moreover, the proposed complaint also cites to various publications which suggest that fake accounts on Facebook are rather ubiquitous. For perspective, the *Washington Post* reported that Facebook deleted three billion fake user accounts in a mere six-month period alone (Prop. Compl. ¶ 95). According to Facebook's own public disclosures, approximately five percent of its monthly active-user-pool comprise of fake accounts. Thus, though Facebook ostensibly catches the vast majority of fake accounts before they enter its monthly pool, given Facebook's over two billion users, at least one hundred million fake accounts are active, roaming its platform at any given time — and presumably some are making clicks. Taken together, plaintiff has plausibly alleged that Facebook charged it for invalid clicks, some of which Facebook determined were invalid and failed to initiate refunds for, and some of which Facebook willfully blinded itself to by not performing an audit.

11

Any shortcoming in pleading with particularity the precise scope of invalid clicks Facebook allegedly charged plaintiff for must be excused at this stage because only Facebook has access to that data. *See Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 568 (9th Cir. 2017).

### C. WHETHER FACEBOOK'S OTHER STATEMENT ARE FALSE AND/OR MISLEADING.

Facebook contends that the proposed complaint has not sufficiently pled falsity as to the remaining Facebook representations quoted therein. This order agrees in part and disagrees in part, as now explained.

As to the following Facebook statements, plaintiff has failed to show how and why they are false and/or deceptive, or even actionable non-puffery:

- "Connect with people. Ads help you reach the right people."

- "Facebook can help you reach all the people who matter most to your business."

- "Facebook ads are optimized to help you get more people to visit your website or increase conversion."

- "Your business is for your customers. Built relationships with them, reach new people and drive sales using Facebook."

- "Drive people to your website with one click from the most engaging place on Facebook."

- "Find new customers. Boost sales. Facebook can help you meet your business goals."

- "Meet the people who will love your business."

To begin, many of these statements — *e.g.*, "people who will matter most to your business" — are puffery because they are difficult to measure concretely.

Furthermore, as the proposed complaint itself concedes, plaintiff's ads weren't just delivered to fake accounts and it wasn't just charged for invalid clicks. That is, Facebook also charged for ads displayed to 'new' and 'interested' customers (Prop. Compl. ¶ 45). To the extent that fake accounts also viewed plaintiff's ads, a reasonable consumer would understand that not all users on Facebook would adhere to Facebook's authenticity policy or would be

interested in its ads. *See Twitter*, 2020 WL 4465966, at *3 ("A reasonable advertiser would understand that achieving its goals might require some interaction with Twitter users who use the platform to disseminate spam, violate Twitter's terms of service, or otherwise qualify as 'fake' despite being human.").

Plaintiff's reliance on its allegation that only "people using their 'real identities' represent potential customers" to argue that the remaining Facebook representations it quotes in the proposed complaint are also false and misleading do not carry the day for it (*see* Prop. Compl. ¶ 10). Presumably, there are real Facebook users who, although they do not use their true and full names, otherwise have provided accurate information concerning their age, gender, and location, among other things. Though, presumably, such an account would violate Facebook's terms of service and be considered fake, it cannot be said that such an account is categorically unable to be interested in plaintiff's ads. Indeed, as plaintiff argues, it is selecting its targeted demographic based on information like age and location, not a person's name. Thus, plaintiff has failed to allege with the requisite particularity required by Rule 9(b) how and why the above representations are false or misleading.

For reasons already discussed, however, this order finds that plaintiff has made a sufficient showing as to why the following statements are false and/or misleading:

- "On Facebook, you'll only pay to reach the right people who'll love your business."

- "Facebook is a community where everyone uses the name they go by in everyday life. This makes it so that you always know who you're connecting with."

Accordingly, when plaintiff files its second amended complaint, it should omit the statements this order has found nonactionable.

2. **ECONOMIC INJURY.**

Lastly, Facebook argues that plaintiff has not sufficiently alleged economic injury sufficient to have standing to sue under Section 17200. This order disagrees.

To establish standing under Section 17200, a plaintiff must demonstrate that he "suffered injury in fact and [] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

The proposed complaint here alleges just that. Specifically, it alleges that plaintiff did not bargain for invalid clicks generated through prohibited means — such as fake accounts — but for "clicks generated through accounts of authentic users — people using their 'real identities' — as people using their 'real identities' represent potential customers" (Prop. Compl. ¶ 10). As a result of Facebook's allegedly deceptive conduct, plaintiff alleges that it "paid for ads for which it would not have agreed to pay anything at all had it known the truth about Facebook's misconduct" (*id*. at ¶ 112). These allegations are sufficient to plead economic injury.

Again, Facebook's specific arguments attacking whether or not plaintiff has plausibly alleged economic injury spring from arguments already refuted above. Namely, that the disclaimer in the self-serve ad terms squarely placed the risk and cost of invalid clicks on the plaintiff, and that Facebook never promised "to conduct an 'audit' of removed accounts to assess whether past clicks from those accounts may have been fraudulent or invalid" (Opp. 11). Facebook contends, therefore, that "[p]laintiff cannot premise its alleged UCL injury 'on the loss of a . . . benefit that was not part of the bargain to begin with.'" (*ibid*.) (quoting *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009). As already discussed, however, Facebook's disclaimer is ambiguous and a reasonable advertiser could still be misled into believing that Facebook's Business Help Center statement promised an audit as part of the bargain, at least if plaintiff's allegations are accepted as true. *Birdsong* is thus inapposite.

In short, the plaintiffs in *Birdsong* alleged that Apple iPod's inherent risk of hearing loss deprived them of the full benefit of their bargain because they couldn't safely listen to music. Our court of appeals held that the loss of safety benefit was never part of the bargain to begin with because the plaintiffs had not alleged that Apple made "any representations that iPod users could safely listen to music at high volumes for extended periods of time." *Id*. at 961. Here, by contrast, Facebook made explicit representations that not charging advertisers "for

14

clicks that are determined to be invalid," which included clicks made by fake accounts, was part of the bargain.

## CONCLUSION

To the foregoing extent, plaintiff's motion for leave to amend to file its second amended complaint is **GRANTED**. Within **SEVEN DAYS** of this order, plaintiff shall file its second amended complaint, making no changes other than omitting the statements this order has found nonactionable. Facebook must answer within **FOURTEEN DAYS** of that. No further Rule 12 motions, please.

**IT IS SO ORDERED.**

Dated: November 11, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE